# NO. 12-12-00290-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *LANTY WYLIE AND PATRICIA WYLIE,* <br> *APPELLANTS* | § | *APPEAL FROM THE 114TH* |
| *V.* | § | *JUDICIAL DISTRICT COURT* |
| *HIDE-A-WAY LAKE CLUB, INC. AND HIDE-A-WAY LAKE COMMUNITY CHURCH,* <br> *APPELLEES* | § | *SMITH COUNTY, TEXAS* |

## *MEMORANDUM OPINION*

Lanty Wylie and Patricia Wylie appeal the trial court's orders denying their motion for summary judgment and granting Appellees, Hide-A-Way Lake Club, Inc.'s and Hide-A-Way Lake Community Church's, respective motions for summary judgment as well as its awards of attorney's fees to Appellees. The Wylies raise six issues on appeal. We affirm.

## BACKGROUND

Hide-A-Way Lake is a residential community that is incorporated as a general law municipality and is located northwest of Tyler, Texas. It is governed by a homeowners association called Hide-A-Way Lake Club, Inc. (the Club). Hide-A-Way Lake (the Subdivision) was developed in the 1960s by two corporations (collectively the Developers)[1] that platted parcels of land into units consisting of demarcated lots.

In early August 1969, the Developers deeded certain property in the Subdivision to the Club. This deed (the Common Area Deed) excluded from the conveyance, among other things,

---

[1] These corporations are Hide-A-Way Lake, Inc. and Lake Hide-A-Way, Inc.

the residential lots in the Subdivision. The Common Area Deed also contained restrictive covenants that stated, in pertinent part, as follows:

1. No noxious or offensive activities shall be carried on upon any of said property nor shall anything be done thereon which may be or become an annoyance or nuisance to the Subdivisions adjacent to the same.

2. No commercial business activity shall be established or operated upon any of the land herein conveyed, SAVE and EXCEPT, however, that this shall not prohibit the operation or granting of concessions for the operation of commercial recreation or entertainment facilities which would contribute or tend to contribute to the enjoyment and welfare of the member property owners of Hide-A-Way Lake, Inc. and Lake Hide-A-Way, Inc. Subdivisions in Smith County, Texas.

. . . .

4. At all times, the land and improvements herein conveyed shall be used and maintained for the exclusive benefit and enjoyment of the member property owners of Hide-A-Way Lake and Lake Hide-A-Way Subdivisions and other members of Grantee.

On August 6, 1969, Lake Hide-A-Way, Inc. filed in the deed records of Smith County, restrictions, covenants, and conditions applicable to Hide-A-Way Lake Unit No. 41 Subdivision "for the purpose of carrying out a general plan of development and maintenance of the subject premises." These restrictions stated, in pertinent part, as follows:

1. No lot shall be used for other than residential purposes (except as elsewhere herein provided) . . . .

. . . .

10. No noxious or offensive activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to the subdivision in which said lot is located.

11. No sale, transfer, lease or other disposition of any lot in the Hide-A-Way Lake Unit No. 41 Subdivision shall be consummated unless and until the Purchaser or transferee has applied for and has been accepted as a member of the Hide-A-Way Lake Club . . . .

12. Upon acceptance of an application for membership in Hide-A-Way Lake Club and the simultaneous execution of a sales contract or the acceptance of a Deed, each owner shall become a member of Hide-A-Way Lake Club, . . . owned and operated by Grantor, its successors or assigns, for the purpose of providing the members with clubhouse and private recreation facilities in the area, and to establish and maintain parks, lanes, lakes, and security protection for the common benefit of lot owners . . . .

**The Church**

During 1972, a group of residents began meeting in various homes to worship. In 1973, the group began negotiating with the Club's board of directors to obtain a site in Unit 41 designated as a park next to the lake's spillway property. On December 23, 1973, the Club and Hide-A-Way Lake Community Church (the Church) entered into a twenty-five year lease of the park property on which the construction of a church building was completed in 1975. In February 1976, the Club's board of directors formally granted the Church permission to use the spillway property[2] for parking. On January 20, 1984, the Club deeded the leased property to the Church as well as an adjoining one-half acre of property.

**Amended Deed Restrictions**

In August 1994, for the purpose of "carry[ing] out a general plan of development and maintenance[,]" the lot owners in the Unit 41 Subdivision adopted amended deed restrictions. These amended restrictions stated, in pertinent part, as follows:

> **II.  SPECIFIC LAND USE**
>
> A.  All lots shall be used for residential purposes. No business usage is allowed if such use entails multiple business-connected vehicle parking. Also, no merchandise, commercial stock, or materials may be visibl[y] stored on any lot.
>
> . . . .
>
> **IV.  GENERAL REGULATIONS**
>
> H.  No noxious or offensive activity shall be carried on upon any lot nor shall anything be done thereon which may be or become an annoyance or nuisance to lot owners within the Club boundaries.
>
> . . . .
>
> **V.  OPERATION AND MAINTENANCE OF RECREATIONAL, SOCIAL AND CULTURAL FACILITIES**
>
> A.  No sale, transfer, lease, or other disposition of any lot within the boundaries of Hide-A-Way Lake Club shall be consummated unless and until the purchaser or transferee has applied for and has been approved as a member of Hide-A-Way Lake Club, Inc. . . . .

---

[2] The spillway property is a semi-circular shaped parcel with a channel dividing it that directs overflow water from one of the subdivision's two lakes to the other. The spillway property is lined densely with trees separating it from the residential properties to its north and west.

**The Wylies Move to Hide-A-Way Lake and the Church's Activities**

In February 1998, the Wylies purchased a home on a lot in the Unit 41 Subdivision. In the spring of 1998, the Club granted an application by the Church for a permit to install a wastewater treatment system, including two spray heads in the southern edge of the spillway property. In the fall of 1999, the Club granted the Church's application to construct an elevator in the spillway, which included the installation of two guard lights on either side of the elevator building.

In September 2003, the Club entered into a lease agreement with the Church for the portion of the spillway it had been using for parking. The lease restricted the Church's use of the land to parking and the wastewater spray field. The lease had a one year term and automatically renewed under the same terms unless terminated by one of the parties.

In the spring of 2006, the Church paved an additional area for parking on its side of the spillway channel and constructed a stairway from the church building to the spillway parking lot. On July 24, 2008, the Club entered into a new lease agreement with the Church, which expanded the leased premises slightly.

**The Wylies' Suit**

The Wylies filed the instant suit against the Club in August 2008. They amended their pleadings on August 25, 2009, and added the Church as a defendant. By their suit, the Wylies sought a declaratory judgment that the applicable deed restrictions, encroachment policy, lease between the Church and the Club, Rules and Regulations of Hide-A-Way Lake, bylaws, and any other governing documents of Hide-A-Way Lake barred the Club from entering into its lease with the Church and barred the existence of the parking lot and septic system on the spillway property. They further sought a declaration that people were barred from parking in the spillway for church services, conferences, and/or permanent parking. The Wylies also sought to recover damages for breach of contract, negligence, nuisance, and for violations of Texas Property Code, Section 202.004. The Club and the Church filed multiple motions for summary judgment, both traditional and no evidence. The Wylies filed a motion for summary judgment seeking a finding from the trial court that they had standing to bring suit. The trial court granted the Club's and the Church's motions for summary judgment in part and denied the Wylies' motion for summary judgment. The Wylies nonsuited their nuisance claim, and the matter proceeded to trial to determine the award of attorney's fees to be awarded the Club, if any. Ultimately, the trial court

rendered a final judgment that the Wylies take nothing by their suit and awarded attorney's fees to the Club and the Church. This appeal followed.

STANDING

In their first issue, the Wylies argue that the trial court erred in denying their motion for summary judgment based on a lack of standing.[3]

**Standard of Review and Rules for Construing Restrictive Covenants**

Standing is a legal question reviewed de novo. *Myer v. Cuevas*, 119 S.W.3d 830, 833 (Tex. App.–San Antonio 2003, no pet.). The test for standing is whether there is "(1) a real controversy between the parties (2) that will be actually determined by the judicial declaration sought." *Antonov v. Walters*, 168 S.W.3d 901, 904 (Tex. App.–Fort Worth 2005, pet. denied).

A restrictive covenant is a contractual agreement between the seller and the purchaser of real property. *Ski Masters of Tex., LLC v. Heinemeyer*, 269 S.W.3d 662, 667 (Tex. App.–San Antonio 2008, no pet.). When construing a restrictive covenant, appellate courts apply general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998); *Ski Masters*, 269 S.W.3d at 668. Covenants are examined as a whole in light of the circumstances present when the parties entered into the agreement. *Ski Masters*, 269 S.W.3d at 667. The reviewing court's primary intent is to ascertain and give effect to the true intention of the parties as expressed in the instruments. *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.–Austin 2007, pet. denied). A trial court's construction of a restrictive covenant is reviewed de novo. *Id.*

**Enforcement of a Restrictive Covenant**

In ordinary circumstances, a restrictive covenant is enforceable only by the contracting parties and those in direct privity of estate with the contracting parties. *Ski Masters*, 269 S.W.3d at 668; *see, e.g.*, *Davis v. Skipper*, 83 S.W.2d 318, 321–22 (Tex. 1935); *Wayne Harwell Props., v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.–San Antonio 1997, writ denied). Circumstances do exist, however, in which a restrictive covenant may be enforced by someone other than the grantor or grantee. *Ski Masters*, 296 S.W.3d at 668. For example, a property owner may subdivide property into lots and create a subdivision in which all property owners agree to the same or similar restrictive covenants designed to further the owner's general

---

[3] Because standing is a component of subject matter jurisdiction, we review the Wylies' motion for summary judgment on the issue of standing as we would a plea to the jurisdiction, construing the pleadings in favor of the plaintiff. *See Brown v. Todd*, 53 S.W.3d 297, 305 n.3 (Tex. 2001).

5

plan or scheme of development. *Id.* Under these circumstances, each purchaser within the subdivision is assumed to benefit from the restrictions and each has the right to enforce the restrictions. *Id.*; *see, e.g.*, *Curlee v. Walker*, 244 S.W. 497, 498 (Tex. 1922) ("It is perfectly clear that it is lawful for districts with restrictions [designed to benefit all property owners] to be created, and also that each purchaser has the right to rely on and to enforce those restrictions.").

In *Hooper v. Lottman*, 171 S.W. 270 (Tex. Civ. App.–El Paso 1914, no writ), which is the seminal case regarding the "controlling general principles of the law" in this area, the court stated as follows:

> [T]he general rule may be safely stated to be that where there is a general plan or scheme adopted by the owner of a tract, for the development and improvement of the property by which it is divided into streets and lots, and which contemplates a restriction as to the uses to which lots may be put, or the character and location of improvements thereon, to be secured by a covenant embodying the restriction to be inserted in the deeds to purchasers, and it appears from the language of the deed itself, construed in the light of the surrounding circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject thereto, and to have the benefit thereof, and such covenants are inserted in all the deeds for lots sold in pursuance of the plan, a purchaser and his assigns may enforce the covenant against any other purchaser, and his assigns, if he has bought with actual or constructive knowledge of the scheme, and the covenant was part of the subject-matter of his purchase.

*Id.* at 272; *see Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex.1990) (describing *Hooper* as "[t]he leading Texas case" in this area); *Curlee*, 244 S.W. at 498 (quoting *Hooper* at length after declaring that "[t]he correct rules that govern covenants of the character set out in the deeds to this restricted district are well stated . . . in [*Hooper* ]"); *see also Ski Masters*, 269 S.W.3d at 668–69. In other words, where an owner of a tract subdivides and sells the subdivided parcels to separate grantees, imposing restrictions on the use of each parcel pursuant to a general plan or scheme of development, each grantee may enforce the restrictions against each other grantee. *Ski Masters*, 269 S.W.3d at 669; *Lehmann v. Wallace*, 510 S.W.2d 675, 680–81 (Tex. Civ. App.–San Antonio 1974, writ ref'd n.r.e.).

**General Plan or Scheme of Development that Induced the Purchasers**

Questions about standing are implicated whenever a property owner seeks to enforce such a restrictive covenant. Standing essentially depends on two things: (1) the existence of a general plan or scheme of development (2) that was part of the inducement for purchasers to obtain land within the restricted area. The court in *Hooper* explained how standing arises in these situations as follows:

> The most familiar cases in which courts of equity have upheld the right of owners of land to enforce covenants to which they were not parties are those in which it has appeared that a general building scheme or plan for the development of a tract of land has been adopted, designed to make it more attractive for residential purposes by reason of certain restrictions to be imposed on each of the separate lots sold. This forms an inducement to each purchaser to buy, and it may be assumed that he pays an enhanced price for the property purchased. The agreement therefore enters into and becomes a part of the consideration. The buyer submits to a burden upon his own land because of the fact that a like burden imposed on his neighbor's lot will be beneficial to both lots. The covenant or agreement between the original owner and each purchaser is therefore mutual. The equity in this particular class of action is dependent as much on the existence of the general scheme of improvement or development as on the covenant, and restrictions which contemplate a general building plan for the common benefit of purchasers of lots are recognized and enforced by courts of equity at the instance of the original grantor or subsequent purchasers.

*Hooper*, 171 S.W. at 272; *see also Evans*, 796 S.W.2d at 466 (noting that concept of general plan of development is frequently connected to standing questions); *Curlee*, 244 S.W. at 498 ("It was implied in each contract that every other contract should have these same provisions of restrictions, as they were for the benefit of all, and at once formed an inducement to each purchaser.").

The standing of a property owner within a subdivision to enforce a restrictive covenant against another similarly situated property owner does not turn on whether the deed of the owner against whom enforcement is sought contains the restriction. *Ski Masters*, 269 S.W.3d at 270. If the deed of the property owner against whom enforcement of the restriction is sought contains the restriction, standing is based on an implied mutuality of covenants among the various purchasers within the subdivision. *Id.*; *see Giles*, 697 S.W.2d at 427 (holding that where many property owners are interested in a restrictive covenant, any one of them can sue to enforce it); *Hooper*, 171 S.W. at 272 (standing is predicated on mutuality of covenant between original owner and each purchaser). If, on the other hand, the deed does not contain the restriction, standing is based on application of the doctrine of implied negative reciprocal easement. *Ski Masters*, 269 S.W.3d at 270; *see Evans*, 796 S.W.2d at 466; *Lehmann*, 510 S.W.2d at 681 (standing to enforce restrictive covenant may be based "either upon the theory that there is a mutuality of covenants and consideration, or upon the ground that mutual negative equitable easements are created"). The doctrine of implied reciprocal negative easement applies when a developer sells a substantial number of lots within a subdivision by deeds containing the restrictive covenant, and the party against whom the restriction is sought to be enforced had

notice of the restriction but the deed did not actually contain the restriction.  *Evans*, 796 S.W.2d at 466.

The analysis of whether a general plan or scheme of development exists is the same whether a party is attempting to enforce an express restriction or seeking application of the doctrine of implied reciprocal negative easement.  *See Ski Masters*, 269 S.W.3d at 270; *Curlee*, 244 S.W. at 498.  The only meaningful difference between the two situations is that the party seeking to enforce an implied negative easement has the additional burden to demonstrate that a "substantial number" of the deeds conveying property within the subdivision contain the restriction.  *Evans*, 796 S.W.2d at 466.

## The Wylies' Standing to Enforce the Restrictive Covenants at Issue

Here, it is apparent that this case is among those "familiar cases" in which the tracts, both residential and common, comprising a residential subdivision were developed with a general building scheme or plan.  *See Hooper*, 171 S.W. at 272.  The common area deed, by which the spillway property was conveyed, and the Unit 41 deed restrictions, which apply to the Wylies' lot, were signed within days of one another.  Although the restrictions set forth in the Common Area Deed and Unit 41 residential deed restrictions and its amendments are not wholly identical, the restrictions regarding "commercial" use and "offensive" and "annoying" activities are common both to the residential lots and the common area.[4]  It is further noteworthy that the Common Area Deed sets forth that "[a]t all times, the land and improvements herein conveyed shall be used and maintained for the exclusive benefit and enjoyment of the member property owners of Hide-A-Way Lake and Lake Hide-A-Way Subdivisions and other members of Grantee."  In complement, the Unit 41 restrictive covenants and amendments thereto state that lot owners in the subdivision must be members of the Club.  Based on our reading of the common area deed and the Unit 41 restrictive covenants, we conclude that a general plan or scheme of development exists at Hide-A-Way Lake that includes both the residential lots and the common areas.[5]

---

[4] It is these restrictions that underlie the Wylies' declaratory judgment action.

[5] We note that the Common Area Deed sets forth a list of persons that may sue to enforce the restrictive covenants contained therein, and that this list does not include members of the Club.  However, this language does not alter the fact that the Subdivision was developed under a general plan or scheme.  Instead, if anything, this clause raises an issue of capacity to sue rather than standing.  *See Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 849 (Tex. 2005) (capacity concerns party's personal right to come into court, while standing concerns question of whether party has enforceable right or interest).

Moreover, in his affidavit attached to the Wylies' motion to reconsider the issue of standing, Lanty Wylie testified with regard to his and his wife's reliance on these restrictions, when they purchased their lot at Hide-A-Way Lake. The affidavit states, in pertinent part, as follows:

> On January 17, 1998, my wife, Patricia, and I signed a Membership Agreement to Hide-A-Way Lake Club, Inc. At the time I signed the Membership Agreement, I had read and understood the Declaration of Covenants, Conditions and Restrictions (Deed Restrictions) that were attached to the Membership Agreement . . . .
>
> I relied on these documents, which included the 1995 Deed Restrictions . . . when I made the decision to pay the requested fees and dues required for Club membership and signed the Membership Agreement. I understood and expected the Club with whom I was contracting to also be bound by the terms of each of the documents listed above. This mutual obligation was part of the benefit of the bargain, to me, of moving to Hide-A-Way Lake Club.
>
> Before signing the Membership Agreement, my wife and I discussed our mutual understanding of the documents listed above. My wife expressed to me her reliance on these above-listed documents in the same manner I did.

Because we have concluded that (1) a general plan or scheme of development exists at Hide-A-Way Lake that includes both the residential lots in the Unit 41 Subdivision and the common areas and (2) these restrictions were part of the inducement for the Wylies to purchase their lot at Hide-A-Way Lake, we hold that the Wylies have standing to enforce these restrictions in common under an implied mutuality of covenants. *Ski Masters*, 269 S.W.3d at 270. The Wylie's first issue is sustained.

## LIMITATIONS

In part of their second issue, the Wylies argue that Appellees failed to establish that they were entitled to summary judgment as a matter of law on the affirmative defense of limitations. Limitations was raised in Appellees' motions for summary judgment only with regard to the Wylie's declaratory judgment and negligence claims.[6]

---

[6] *See* **Stiles v. Resolution Trust Corp.**, 867 S.W.2d 24, 26 (Tex.1993) (movant is not entitled to summary judgment on grounds not alleged in motion); **Hall v. Stephenson**, 919 S.W.2d 454, 464 (Tex. App.–Fort Worth 1996, writ denied). The Wylies later amended their pleadings to add additional causes of action. In their respective motions for summary judgment pertaining to these later-filed causes of actions, Appellees did not raise the issue of limitations.

## Summary Judgment

The standard for reviewing a traditional summary judgment is well established. *See Sysco Food Servs. v. Trapnell*, 890 S.W.2d 796, 800 (Tex. 1994); *Nixon v. Mr. Prop. Mgmt. Co.*, 690 S.W.2d 546, 548–49 (Tex. 1985); *First Union Nat'l Bank v. Richmont Capital Partners I, L.P.*, 168 S.W.3d 917, 923 (Tex. App.–Dallas 2005, no pet.). The movant for traditional summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nixon*, 690 S.W.2d at 548. When the movant seeks summary judgment on a claim in which the nonmovant bears the burden of proof, the movant must either negate at least one essential element of the nonmovant's cause of action or prove all essential elements of an affirmative defense. *See Randall's Food Mkt., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995). When the movant seeks summary judgment on a claim in which the movant bears the burden of proof, the movant must prove all essential elements of the claim. *Winchek v. Am. Express Travel Related Servs. Co.,* 232 S.W.3d 197, 201 (Tex. App.–Houston [1st Dist.] 2007, no pet.). Once the movant has established a right to summary judgment, the burden shifts to the nonmovant to respond to the motion and present to the trial court any issues that would preclude summary judgment. *See City of Houston v. Clear Creek Basin Auth.*, 589 S.W.2d 671, 678–79 (Tex. 1979).

Additionally, after an adequate time for discovery has passed, a party without the burden of proof at trial may move for summary judgment on the ground that the nonmoving party lacks supporting evidence for one or more essential elements of its claim. *See* TEX. R. CIV. P. 166a(i). Once a no evidence motion has been filed in accordance with Rule 166a(i), the burden shifts to the nonmovant to bring forth evidence that raises a fact issue on the challenged evidence. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). We review a no evidence motion for summary judgment under the same legal sufficiency standards as a directed verdict. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 750–51 (Tex. 2003). A no evidence motion is properly granted if the nonmovant fails to bring forth more than a scintilla of probative evidence to raise a genuine issue of material fact as to an essential element of the nonmovant's claim on which the nonmovant would have the burden of proof at trial. *Id*. at 751. If the evidence supporting a finding rises to a level that would enable reasonable, fair minded persons to differ in their conclusions, then more than a scintilla of evidence exists. *Id*. Less than a scintilla of

evidence exists when the evidence is so weak as to do no more than create a mere surmise or suspicion of a fact, and the legal effect is that there is no evidence. *Id.*

In both traditional and no evidence summary judgment motions, we review the entire record de novo and in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *See Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006); *KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.*, 988 S.W.2d 746, 748 (Tex. 1999). All theories in support of or in opposition to a motion for summary judgment must be presented in writing to the trial court. *See* TEX. R. CIV. P. 166a(c). If the trial court's order does not specify the grounds on which it granted summary judgment, we affirm the trial court's ruling if any of the theories advanced in the motion is meritorious. *State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380 (Tex. 1993).

Moreover, when a party moves for both a traditional and a no evidence summary judgment, generally, we first review the trial court's summary judgment under the no evidence standards of Rule 166a(i). *Ridgway*, 135 S.W.3d at 600. If the no evidence summary judgment was properly granted, we do not reach arguments made under the traditional motion for summary judgment. *See id.* at 602. It logically follows, however, that this rule cannot be applied unless the same issue was raised in both motions. *See Dunn v. Clairmont Tyler, LP*, 271 S.W.3d 867, 870 (Tex. App.–Tyler 2008, no pet.). In this case, the limitations issue is dispositive of the Wylies' claims for declaratory judgment and negligence, but was raised only in Appellees' respective traditional motions on these claims. *See id.* Therefore, we need not address Appellees' no evidence motions for summary judgment in this instance.

## Governing Law

The primary purpose of statutes of limitations is to compel the exercise of a right of action within a reasonable time so that the opposing party has a fair opportunity to defend while witnesses are available and the evidence is fresh in their minds. *Willis v. Maverick*, 760 S.W.2d 642, 644 (Tex. 1988); *see also Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 734–35 (2001) (citing *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 918 S.W.2d 453, 455 (Tex. 1996); *S.V. v. R.V.*, 933 S.W.2d 1, 3 (Tex. 1996)). It is in society's best interest to grant repose by requiring that disputes be settled or barred within a reasonable time. *Horwood*, 58 S.W.3d 732, 734–35. Generally, a cause of action accrues when a wrongful act causes a legal injury, even if the fact of injury is not discovered until later, and even if all resulting damages have not yet occurred. *See*

***S.V.***, 933 S.W.2d at 3; *see also* ***Li v. Univ. of Tex. Health Sci. Ctr. at Houston***, 984 S.W.2d 647, 651 (Tex. App.–Houston [14th Dist.] 1998, pet. denied).

Because Appellees moved for summary judgment on the ground of the statute of limitations, they were required to (1) conclusively prove when the cause of action accrued, and (2) negate the discovery rule, if it applies and was pleaded or otherwise raised. *See* ***KPMG Peat Marwick v. Harrison Cnty. Hous. Fin. Corp.***, 988 S.W.2d 746, 748 (Tex. 1999); ***Rice v. Louis A. Williams & Assocs., Inc.***, 86 S.W.3d 329, 333 (Tex. App.–Texarkana 2002, pet. denied). Because, here, the Wylies did not plead or otherwise raise the discovery rule, we will focus our analysis on whether Appellees conclusively proved when the cause of action accrued.

The limitations period for the Wylies' declaratory judgment action through which they sought to enforce restrictive covenants is four years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.051 (West 2008); ***Girsh v. St. John***, 218 S.W.3d 921, 925 (Tex. App.–Beaumont 2007, no pet.). The limitations period for their negligence cause of action is two years. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 16.003(a) (West Supp. 2013).

**Accrual of Limitations Period**

In the instant case, the Wylies filed their original petition on August 28, 2008. In their respective motions for summary judgment, Appellees argued that the evidence conclusively demonstrated that the events underlying the Wylies' claimed injuries each occurred outside of the applicable limitations period. In their response to Appellees' motions for summary judgment, the Wylies argued that the event that gave rise to their suit is the Club's decision to enter into a lease agreement with the Church on July 24, 2008. Specifically, they contended that this decision and the Club's and the Church's subsequent violations of the applicable restrictive covenants form the bases of their claims. They further argued that the spillway had been subject to an increase in use since the Club entered into the 2008 lease with the Church. In their live pleadings, the Wylies sought a declaratory judgment as follows:

> Plaintiffs seek a declaratory judgment, and ask this Court to interpret the applicable deed restrictions, encroachment policy, lease between the Church and HAWL, Rules and Regulations of HAWL, bylaws, and any other governing documents of HAWL, as barring the above-pled conduct of HAWL and as barring the ability of HAWL to enter into the lease which it entered into in 2008 with the Church concerning the spillway, and as barring the existence of the parking lot on the spillway as well as the septic system and the other structures that have been constructed on the spillway by the church . . . and as barring people from parking in the spillway for church services, conferences, and/or permanent parking.

Moreover, the Wylies sought to recover for negligence for the Club's failure to enforce deed restrictions and restrictive covenants, bylaws, rules and regulations, and policies by its permitting the Church to maintain a parking lot on the spillway, utilize a commercial septic system on the spillway, operate bright lights on the spillway, fail to cause its members to abide by the security policies of the Club, maintain encroachments on the spillway, and permit people to park on the spillway.

This court has considered a similar question of when a limitation period accrues for a suit based on an ongoing activity. *See **Park v. Baxter***, 572 S.W.2d 794, 795 (Tex. Civ. App.–Tyler 1978, writ ref'd n.r.e.). In ***Park***, the defendants were operating a music and swimming school on their property. *Id.* at 795. The plaintiff sought to enforce covenants restricting the use of the defendants' property to residential use and uses not constituting a nuisance. *Id.* at 794–95. The evidence indicated that the defendants purchased their property in August 1967 and immediately commenced offering piano lessons on the property. *Id.* at 795. The piano lessons were taught continuously with no more than "a couple of days" on which lessons were not taught up until the time the suit was filed on October 17, 1974. *See id.* The evidence further indicated that during 1969, the average number of music lessons taught per month increased from twenty-six to sixty. This court held that the evidence clearly demonstrated a commercial business was being operated on the property in question in 1968 and 1969 and, as a result, the trial court properly found that the plaintiff's suit was barred by the applicable four year statute of limitations. *See id.*

### Evidence of Accrual of Limitations Period

In the instant case, the summary judgment evidence conclusively demonstrates that, in February 1976, the Club's board of directors agreed to allow the Church to use the spillway property for parking. Moreover, in the spring of 1998, after the Wylies purchased their property, the Club granted an application by the Church for a permit to install a wastewater treatment system, including two spray heads in the southern edge of the spillway property. Although there is evidence that the septic system was constructed in 1998, according to Lanty Wylie's deposition testimony, the septic system was constructed no later than approximately 2001, "a few years after they purchased their property." Further, in the fall of 1999, the Club granted the Church's application to construct an elevator in the spillway, which included the installation of two guard lights on either side of the elevator building. There is evidence that construction of the elevator and guard lights occurred in 1999. Lanty Wylie's deposition testimony indicates

13

that this construction occurred on a later date. But in any event, Lanty Wylie acknowledged that the septic system and the elevator and its appurtenances were in existence in 2003.[7]

Further still, in September 2003, the Club entered into a lease agreement with the Church for the portion of the spillway it had been using for parking.[8] The lease restricted the Church's use of the land to parking and the wastewater spray field. The lease had a one year term and automatically renewed under the same terms unless terminated by one of the parties. In the spring of 2006, the Church paved an additional area for parking on its side of the spillway channel and constructed a stairway from the church building to the spillway parking lot. On July 24, 2008, the Club entered into a new lease agreement with the Church, which expanded the leased premises slightly.

The injuries of which the Wylies complain stem from (1) people parking on the spillway, (2) the operation of a septic system on the spillway, and (3) the bright lights next to the elevator on the spillway. By the time the Wylies filed their suit in August 2008, the Church had been using the spillway property for parking for over thirty years. Any evidence supporting the property's increased use for parking has no bearing on the date this alleged injury first occurred or a renewed accrual date for the limitations period. *See* *S.V.*, 933 S.W.2d at 3; *Park*, 572 S.W.2d at 795. Moreover, the septic system and elevator lights of which the Wylies complain had been in existence for at least five years by the time the Wylies filed the instant suit. Finally, the 2008 Lease between the Club and the Church that underlies the Wylies' argument that they timely filed these claims is preceded by a 2003 formalized lease. The particular terms of these two leases are not identical, but involve largely the same subject matter.

Because the summary judgment evidence conclusively demonstrates that the injuries underlying the Wylies' declaratory judgment and negligence actions first occurred more than four years before they filed the instant suit, we conclude that these causes of action are barred by the applicable statutes of limitations. Therefore, we hold that the trial court did not err in granting summary judgment for Appellees on the Wylies' declaratory judgment and negligence

---

[7] The septic system and the elevator and its appurtenances are acknowledged in the September 2003 lease agreement between the Club and the Church. Moreover, in his deposition testimony, Lanty Wylie acknowledged that the structures at issue existed in the fall of 2003.

[8] This lease acknowledges the existence of the elevator and appurtenances thereto.

claims. The Wylies' second issue is overruled to the extent that it pertains to Appellees' affirmative defense of limitations.[9]

**BREACH OF CONTRACT-BYLAWS**

In their fifth issue, the Wylies argue that the trial court erred in granting Appellees' respective motions for summary judgment on the Wylies' breach of contract claim.[10] Specifically, they argue that they could recover for breach of contract for the Club's failure to adhere to its bylaws.

**Governing Law**

The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach. *B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.–Houston [1st Dist.] 2009, pet. denied). "A breach of contract occurs when a party fails or refuses to do something he has promised to do." *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.–Houston [14th Dist.] 2006, pet. denied).

In construing a written contract, the primary concern of the court is to ascertain the true intentions of the parties as expressed in the instrument. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *see also Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). To achieve this objective, courts should examine and consider the entire writing in an effort to harmonize and give effect to all the provisions of the contract so that none will be rendered meaningless. *Id.* No single provision taken alone will be given controlling effect; rather, all the provisions must be considered with reference to the whole instrument. *Id.*; *Myers v. Gulf Coast Minerals Mgmt. Corp.*, 361 S.W.2d 193, 196 (Tex. 1962).

If the written instrument is so worded that it can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and the court will construe the contract as a

---

[9] Because we have determined that the trial court properly granted summary judgment in favor of Appellees as to the Wylies' breach of covenant and negligence claims on the affirmative defense of limitations, we do not reach the remainder of the Wylies' second issue pertaining to other affirmative defenses upon which the summary judgment could have been based. *See* TEX. R. APP. P. 47.1. Likewise, we do not address the Wylies' third issue concerning the trial court's refusal to grant a declaratory judgment concerning the applicability of restrictions and the violation thereof, or their fourth issue concerning the trial court's grant of summary judgment on their negligence cause of action. *Id.*

[10] The Club raised a no evidence claim in its motion for summary judgment. *See* TEX. R. CIV. P. 166a(i). The Church adopted the Club's no evidence motion.

matter of law. *Coker*, 361 S.W.2d at 393. The interpretation of an unambiguous contract is a question of law, which we review de novo. *See MCI Telecomm. Corp. v. Tex. Utils. Elec. Co.*, 995 S.W.2d 647, 650 (Tex. 1999). Ambiguity does not arise simply because the parties advance conflicting interpretations of the contract; rather, for an ambiguity to exist, both interpretations must be reasonable. *Lopez v. Munoz, Hockema & Reed, L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000).

In interpreting a contract, we must presume that the parties thereto intended every clause to have some effect; therefore, we consider each part of the document with every other part of the document so that the effect and meaning of one part on any other part may be determined. *See Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.–San Antonio 2001, pet. denied). Moreover, we give terms their plain, ordinary, and generally accepted meaning unless the instrument shows that the parties used such terms in a technical or different sense. *Id.* Finally, we enforce an unambiguous agreement as written. *Id.* We are not permitted to rewrite an agreement to mean something it did not. *Id.* We cannot change the contract simply because we or one of the parties comes to dislike its provisions or thinks that something else is needed in it. *Id.* Parties to a contract are masters of their own choices and are entitled to select what terms and provisions to include in or omit from a contract. *Id.*

## The Club Bylaws

Texas courts have recognized that association bylaws may constitute a contract between the parties. *Monasco v. Gilmer Boating & Fishing Club*, 339 S.W.3d 828, 832 (Tex. App.–Texarkana 2011, no pet.) (citing *Lundine v. McKinney*, 183 S.W.2d 265, 273 (Tex. Civ. App.–Eastland 1944, no writ)). But even assuming the bylaws in this case are contractual, the Wylies were still required to provide summary judgment evidence supporting that the Club breached its obligations under the bylaws. *See* TEX. R. CIV. P. 166a(i).

In their pleadings, the Wylies allege that the Club breached the contract by failing to enforce the bylaws. On appeal, neither party argues that the bylaws are ambiguous, but each interprets them differently. The Wylies argue that the following section of the Club's bylaws supports their position:

> Section Thirteen. **Construction Standards.** The Board of Directors shall adopt and require enforcement of appropriate standards governing all construction within the boundaries of Hide-A-Way Lake Club, Inc. It shall require the issuance of permits prior to (1) construction of any structure[,] (2) clearing of land, prior to or as part of any construction[,] (3) major alteration

16

and/or additions to any existing structure[, and] (4) installation of sanitary and other facilities as part of any construction. The Board may prescribe conditions for land usage designed to protect health and property, and for environmental protection and enhancement. When necessary, it shall bring suit to enforce compliance with Club regulations.

The Wylies interpret the last sentence of Section Thirteen as mandating the club to enforce all Club regulations. We disagree.

Although Section Thirteen mandates the adoption of construction standards and permits the board of directors to prescribe conditions for land usage, it stops short of mandating that the board bring suit to enforce compliance with these regulations. Indeed, the last sentence of Section Thirteen contains the word "shall," which is a term construed as mandating behavior. But that mandatory language is immediately preceded by the phrase "[w]hen necessary, . . . ." The "when necessary" language serves to give the board of directors discretion in determining when to file suit to enforce these regulations. This interpretation is consistent with the bylaws as a whole. In at least two other instances, the bylaws provide for the enforcement of violations thereof. Section Seven provides that the board of directors *may* suspend individual members from club privileges and use of club facilities for, among other things, serious or repeated violations of club bylaws, rules, or regulations and violations of deed restrictions or restrictive covenants. Similarly, in Section Ten, any director *may* be removed from office for abuse of authority, which includes actions in violation of the bylaws, rules, regulations, or other club governing documents. Based on our reading of the bylaws as a whole, we conclude that the language therein is not ambiguous and does not mandate that the Club or its board of directors enforce every violation of the bylaws. The Wylies' fifth issue is overruled.

## ATTORNEY'S FEES AWARDED TO THE CLUB

In part of their sixth issue, the Wylies argue that the trial court erred in awarding attorney's fees to the Club under Texas Civil Practice and Remedies Code, Section 37.009 because the Club did not meet its burden of segregating the fees.

### Standard of Review and Governing Law

The grant or denial of attorney's fees in a declaratory judgment action lies within the discretion of the trial court, and its judgment will not be reversed on appeal absent a clear showing that it abused its discretion. *Oake v. Collin Cnty.*, 692 S.W.2d 454, 455 (Tex. 1985);

17

*NP Anderson Cotton Exch., L.P. v. Potter*, 230 S.W.3d 457, 466 (Tex. App.–Fort Worth 2007, no pet.); *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 143 (Tex. App.–El Paso 1997, pet. denied); *see Ridge Oil Co. v. Guinn Invs. Inc.*, 148 S.W.3d 143, 163 (Tex. 2004) (using abuse of discretion standard of review when evaluating nondeclaratory judgment actions).  Under the Texas Declaratory Judgment Act (the Act), a court "may award costs and reasonable and necessary attorney's fees as are equitable and just."  TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 (West 2008); *Potter*, 230 S.W.3d at 466.  "The statute . . . affords the trial court a measure of discretion in deciding whether to award attorney's fees" and places few restrictions on this discretion.  *See Bocquet v. Herring*, 972 S.W.2d 19, 20–21 (Tex. 1998).  Reasonableness and necessity are fact questions; the equity and justice of the fee award are left to the trial court's discretion.  *Ridge Oil Co.*, 148 S.W.3d at 161; *Bocquet*, 972 S.W.2d at 21; *Potter*, 230 S.W.3d at 466.

The general rule is that attorney's fees attributable to other defendants and other causes of action must be segregated.  *Flagship Hotel, Ltd. v. City of Galveston*, 117 S.W.3d 552, 565 (Tex. App.–Texarkana 2003, pet. denied); *see Stewart Title Guar. Co. v. Aiello*, 941 S.W.2d 68, 73 (Tex. 1997).  An exception to the duty to segregate arises when the party's claims are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts.  TEX. R. APP. P. 44.1(a); *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311 (Tex. 2006); *Flagship Hotel*, 117 S.W.3d at 565.  The determination of whether attorney's fees can be segregated is a question for the court.  *Flagship Hotel*, 117 S.W.3d at 565.  This determination requires a consideration of the substantive law necessary to establish facts to support a recovery of the multiple claims.  *Id.*  An attorney is not required to submit separate billing records for recoverable and unrecoverable claims.  *See Tony Gullo Motors I, L.P.* 212 S.W.3d at 314.  Opinion testimony from the attorney is sufficient evidence to show the portion of services that were necessary to advance the recoverable claim or defense.  *Id.*

**Evidence of Segregation of Fees**

In the case at hand, Jadd Masso, the Club's primary trial attorney, testified concerning the fees charged by his firm and how they were segregated.  In his narrative testimony to the court, Masso stated, in pertinent part, as follows:

The total amount that has been incurred on behalf of Hide-A-Way Lake Club today in this case - - the total amount of fees has been $130,068. The total amount of expenses that have been incurred through our firm total $9,921. The total of that - - the total amount that has been billed by my firm to - - or on behalf of Hide-A-Way Lake Club at this point is . . . $139,898 . . . .[11]

. . . .

Because there have been some claims in this case for which the club is not entitled to recover its attorney's fees, I did go back through all of our time records and do an analysis of time that should be segregated out and not assessed against the Wylies. And what I was able to do is review particular bills from certain periods of time where other claims other than the declaratory judgment action were being litigated. In particular, during the time frame of August 2008 through August of 2009, the breach of fiduciary duty claims. During that time, based on my analysis of the individual time entries as shown in our bills, I was able to cut between 40 and 50 percent of that time depending on the bill. But on average, 40 to 50 percent. That is the amount of time that should not be assessed against the Wylies.

During the period of time from June to October of 2010, we were litigating the negligence and nuisance claims. Again, based on that, approximately 50 to 60 percent of the time incurred during that period of time would not be suitable to be recovered under the declaratory judgment act.

And then finally, most recently, from October 2011 to the present, the contract claims and Property Code claims and the exemplary damages claims were being litigated. As a result of those being in the case, we - - my analysis is that 20 to 30 percent of that time should not be included in an assessment against the Wylies.

Of course, all of the claims focused on some of the central issues of the case, being the deed restrictions themselves, which deed restrictions apply to which parcels of property, and whether those restrictions were being violated. So as a result, the legal issues are largely intertwined. Of course, the factual issues are intertwined . . . .

. . . .

So based on my review of the time entries, also going back and reviewing most of the pleadings filed in this case, the discovery responses outlined, the depositions, and things of that nature, I was able to make the adjustments I detailed just a moment ago.

And so as a result, the total amount of attorney's fees incurred to date by the club that we seek to recover under the declaratory judgments act is $85,340. The amount of expenses recoverable under that same act are $6,218. And so the total amount we are requesting is $91,558.

It's my opinion that these attorney's fees were necessary in defending the declaratory judgment act brought by the plaintiffs and that the amount that we are seeking is reasonable under the circumstances of this case.

That's - - I would also make the same opinion as to contingent fees on appeal. If the Wylies do appeal the Court's judgment in the declaratory judgment act case, I believe that a fee of $15,000 for an appeal to the Court of Appeals would be appropriate . . . .

For the three phases of appeal to the Supreme Court, should it go that far, I believe a fee of $5,000 for the petition for review phase in the Supreme Court, a fee of $5,000 for merits briefing in the Supreme Court, an additional $5,000 for oral argument in the Supreme Court would be appropriate if the case is appealed that far by the Wylies.

---

[11] Two exhibits consisting of Masso's firm's billing records were admitted into evidence.

The trial court awarded the Club $91,558.00 in attorney's fees. The trial court further awarded attorney's fees contingent on an unsuccessful appeal to the court of appeals and supreme court consistent with Masso's testimony. Based on Masso's testimony and the exhibits admitted at trial, we conclude that the Club met its burden of segregating attorney's fees recoverable under the Act. Therefore, we hold that the trial court did not err in awarding attorney's fees to the Club. To the extent it pertains to the Club's recovery of attorney's fees, the Wylies' sixth issue is overruled.

### ATTORNEY'S FEES AWARDED TO THE CHURCH

In the remainder of their sixth issue, the Wylies argue that the trial court erred in awarding attorney's fees to the Church. Specifically, they argue that in its motion for summary judgment, the Church sought sanctions pursuant to Texas Civil Practice and Remedies Code, Section 10.004 and Texas Rules of Civil Procedure 13 and 215.2(b), including, but not limited to an award of attorney's fees. Thus, they argue, because the trial court "did not choose to impose sanctions on the Wylies," but rather, merely awarded attorney's fees, the award was improper because the trial court could not grant summary judgment on grounds not presented in the motion.[12]

Sanctions available under Rule 215.2(b) may be awarded for violations of Rule 13. *See* TEX. R. CIV. P. 13, 215.2(b). These sanctions may include attorney's fees. *See* TEX. R. CIV. P. 215.2(b)(8). Attorney's fees are likewise available as sanctions under Section 10.002. *See* TEX. CIV. PRAC. & REM. CODE ANN. 10.002(c) (West 2002).

In the instant case, in its motion for summary judgment, the Church argued that it was entitled to sanctions pursuant to the aforementioned authorities including, but not limited to, attorney's fees. The trial court awarded the Church $85,123.59 in attorney's fees as well as attorney's fees contingent on the Wylies' prosecuting unsuccessful appeals. We hold that the trial court's award of attorney's fees is supported by the Church's argument in its motion for summary judgment. The remainder of the Wylies' sixth issue is overruled.

---

[12] The Wylies have not argued that the award of sanctions was otherwise improper under Section 10.004 or Rules 13 or 215.2(b) or not supported by conclusive evidence. *See* TEX. R. APP. P. 38.1(i).

20

We have sustained the Wylies' first issue and overruled their second issue in part as well as their fifth and sixth issues.  As set forth previously, our consideration of the remainder of their second issue and their third and fourth issues is unnecessary.  Accordingly, we *affirm* the trial court's judgment.

JAMES T. WORTHEN
Chief Justice

Opinion delivered December 20, 2013.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)



# COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS

# JUDGMENT

**DECEMBER 20, 2013**

**NO. 12-12-00290-CV**

**LANTY WYLIE AND PATRICIA WYLIE,**
Appellants
V.
**HIDE-A-WAY LAKE CLUB, INC. AND
HIDE-A-WAY LAKE COMMUNITY CHURCH,**
Appellees

Appeal from the 114th District Court
of Smith County, Texas (Tr.Ct.No. 08-2127-B)

THIS CAUSE came to be heard on the oral arguments, appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, and that all costs of this appeal are hereby adjudged against the appellants, **LANTY WYLIE AND PATRICIA WYLIE,** for which execution may issue, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*