Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


# OPINION

No. 04-07-00721-CV

**SKI MASTERS OF TEXAS, LLC** and Don Ennis,
Appellants

v.

Ronald **HEINEMEYER**, Karen Heinemeyer, Arthur Creager, Patsy Jean Creager,
Thomas Price, Sheryl Price, George Stone and Sandra Stone,
Appellees

From the 25th Judicial District Court, Guadalupe County, Texas
Trial Court No. 04-1945-CV
Honorable Gary L. Steel, Judge Presiding

Opinion by:    Rebecca Simmons, Justice

Sitting:    Alma L. López, Chief Justice
Phylis J. Speedlin, Justice
Rebecca Simmons, Justice

Delivered and Filed:   August 29, 2008

AFFIRMED

This restrictive covenant case arises from the purchase of a parcel of property in an area referred to as the Carlson Subdivision by Appellant Ski Masters of Texas, LLC, owned by Appellant Don Ennis (Ski Masters and Ennis are referred to collectively as "Ski Masters"). Appellees Ronald Heinemeyer, Karen Heinemeyer, Arthur Craeger, Patsy Jean Craeger, Thomas Price, Sheryl Price, George Stone, & Sandra Stone (collectively, the "Residents") own property in the Carlson Subdivision. The Residents sued Ski Masters to enforce residential-only use

restrictions. After a bench trial, the trial court entered judgment for the Residents. We affirm the judgment of the trial court.

## BACKGROUND

In 1956, Milton and Evelyn Carlson (collectively, "Carlson") platted and subdivided a 6.76 acre property into ten tracts of land of varying acreages. The plat was not recorded. Between 1957 and 1972, Carlson sold the ten tracts of land to various people.

The first of these deeds conveyed what the parties call "tract 7" from Carlson to Kenneth Fleming (the "Fleming Deed"). This deed, which was recorded in volume 311, page 208 of the real property records of Guadalupe County, contained the following provisions (emphasis added):

This conveyance is made subject to the following conditions and restrictions:

    a.    *Said premises shall be used for residential purposes only and no business of any nature shall be conducted thereon. . . .*

. . . .

The above conditions and restrictions shall be covenants running with the land, and shall be enforceable by injunction, suit for damages or other appropriate remedy at the election of the person or persons entitled to enforce same, and shall be binding on the grantees herein, their heirs and assigns for a period of 25 years from this date after which time said covenants shall be automatically extended for successive periods of 10 years each unless an instrument signed by a majority of the then owners of any portion of the hereinbefore mentioned 6.76 acres of land, known as the Carlson tract, has been recorded whereby such owners agree to change said conditions and restrictions in whole or in part.

. . . .

*Grantor also, by this instrument subjects the remainder of the 6.76 acres of land with these same restrictions, conditions and options, whether embodied in future instruments of conveyance or not.*

The deeds by which Carlson conveyed seven of the remaining nine original tracts reference and incorporate the restrictions contained in the Fleming Deed. Although the incorporating language is not identical, each of the seven deeds reference the volume and page number of the Fleming

Deed and contain language similar to the following: "It is expressly understood that this conveyance is subject to the same restrictions, conditions, options and exceptions set out and recorded in Volume 311, Page 208 of the Guadalupe County deed records [i.e., the Fleming Deed]." Carlson did not include such language in the deeds conveying tracts 2 and 4.

In June 2004, Ski Masters purchased property including portions of tracts 4 and 5, as well as a very small amount of adjacent land that was not included in the original 6.76 acre tract. The deed by which Ski Masters purchased this property states that the conveyance is subject to the restrictive covenants set out in the Fleming Deed. Moreover, Ennis and his realtor were aware of the deed restrictions at the time of purchase.

The Residents and Ski Masters each filed suit against one another, and the suits were consolidated. The Residents sought to enforce the residential-only restrictions against Ski Masters' proposed use of its property. Ski Masters sought a declaration that the property was not subject to any valid restrictions enforceable by the Residents. The trial court granted a temporary injunction enjoining Ski Masters from constructing a ski school or engaging in any activity violating the alleged residential-only restriction. All parties filed motions for summary judgment, which the trial court denied.

The case was set for a bench trial and at the time of trial, the parties agreed that the trial court should decide the case on the evidence and pleadings already in the record, including the summary judgment evidence filed by both parties and the transcript of the temporary injunction hearing. The trial court signed a final judgment for the Residents and subsequently entered findings of fact and conclusions of law. These findings and conclusions reflect the trial court's determination that the Ski Masters property was subject to an express residential-only restriction, and alternatively was burdened by an implied reciprocal negative easement precluding use of the

property for business activities. The trial court also awarded the Residents trial and appellate attorneys' fees. Ski Masters appeals.

## STANDARD OF REVIEW

The trial court's findings of fact have the same force and dignity as a jury's verdict and are reviewable for legal and factual sufficiency under the same standards as applied to the reviewing of a jury verdict. *Anderson v. City of Seven Points*, 806 S.W.2d 791, 794 (Tex. 1991). Findings that are supported by competent evidence are ordinarily binding on an appellate court. *Reyes-Retana v. PTX Food Corp.*, 709 S.W.2d 695, 697 (Tex. App.—San Antonio 1986, writ ref'd n.r.e.). A trial court's conclusions of law are reviewed de novo. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (Tex. 2002). If a conclusion of law is erroneous, but the judgment is still proper, the erroneous conclusion does not require reversal. *Id.* Likewise, no reversal is warranted if "controlling findings of fact will support the judgment under a correct legal theory." *Lifshutz v. Lifshutz*, 199 S.W.3d 9, 17 (Tex. App.—San Antonio 2006, pet. denied).

When construing a restrictive covenant, appellate courts apply general rules of contract construction. *Pilarcik v. Emmons*, 966 S.W.2d 474, 478 (Tex. 1998). Covenants are examined as a whole in light of the circumstances present when the parties entered into the agreement. *Id.* The reviewing court's primary intent is to ascertain and give effect to the true intention of the parties as expressed in the instruments. *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied). A trial court's construction of a restrictive covenant is reviewed de novo. *Id.*

Ski Masters challenges the Residents' standing to enforce a restrictive covenant. Standing is a legal question reviewed de novo. *Myer v. Cuevas*, 119 S.W.3d 830, 833 (Tex. App.—San Antonio 2003, no pet.). The test for standing is whether there is "(1) a real

controversy between the parties (2) that will be actually determined by the judicial declaration sought." *Antonov v. Walters*, 168 S.W.3d 901, 904 (Tex. App.—Fort Worth 2005, pet. denied). Ordinarily, any person entitled to benefit under a restrictive covenant is entitled to enforce it. *Anderson v. New Prop. Owners' Ass'n of Newport, Inc.*, 122 S.W.3d 378, 384 (Tex. App.—Texarkana 2003, pet. denied). Where many property owners are interested in a restrictive covenant, any one of them can enforce it. *Giles v. Cardenas*, 697 S.W.2d 422, 427 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.).

## ANALYSIS

On appeal, Ski Masters challenges the Residents' standing to enforce a restrictive covenant, the existence of a valid express restrictive covenant, application of the doctrine of implied reciprocal negative easement to imply such a covenant, and the attorneys' fees award.

The initial conveyance of tract 4 by Carlson contained no restrictions. However, the deed by which Ski Masters obtained its tract identifies "exceptions to conveyance" that include "[r]estrictive covenants as set out in instrument recorded in Volume 311, Page 208, of the Deed Records of Guadalupe County, Texas [i.e., the Fleming Deed] . . . ." Thus, the issue is not whether Ski Masters' tract is subject to the restrictions imposed in the Fleming Deed – it unquestionably is. The issue is whether the Residents, all of whom are outside the tract's chain of title, have standing to enforce those restrictions against Ski Masters.

## A. General Principles Stated

### 1. General Scheme or Plan of Development

A restrictive covenant is a contractual agreement between the seller and the purchaser of real property. In ordinary circumstances, a restrictive covenant is enforceable only by the contracting parties and those in direct privity of estate with the contracting parties. *See, e.g.*, *Davis v. Skipper*, 125 Tex. 364, 83 S.W.2d 318, 321-22 (1935); *Wayne Harwell Props. v. Pan*

*Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied). Circumstances do exist, however, in which a restrictive covenant may be enforced by someone other than the grantor or grantee. For example, a property owner may subdivide property into lots and create a subdivision in which all property owners agree to the same or similar restrictive covenants designed to further the owner's general plan or scheme of development. Under these circumstances, each purchaser within the subdivision is assumed to benefit from the restrictions and each has the right to enforce the restrictions. *See, e.g.*, *Curlee v. Walker*, 112 Tex. 40, 244 S.W. 497, 498 (1922) ("It is perfectly clear that it is lawful for districts with restrictions [designed to benefit all property owners] to be created, and also that each purchaser has the right to rely on and to enforce those restrictions.").

*Hooper v. Lottman*, 171 S.W. 270 (Tex. Civ. App.—El Paso 1914, no writ), is the seminal case regarding the "controlling general principles of the law" in this area, and is worthy of extensive quotation:

> [T]he general rule may be safely stated to be that where there is a general plan or scheme adopted by the owner of a tract, for the development and improvement of the property by which it is divided into streets and lots, and which contemplates a restriction as to the uses to which lots may be put, or the character and location of improvements thereon, to be secured by a covenant embodying the restriction to be inserted in the deeds to purchasers, and it appears from the language of the deed itself, construed in the light of the surrounding circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject thereto, and to have the benefit thereof, and such covenants are inserted in all the deeds for lots sold in pursuance of the plan, a purchaser and his assigns may enforce the covenant against any other purchaser, and his assigns, if he has bought with actual or constructive knowledge of the scheme, and the covenant was part of the subject-matter of his purchase.

*Id.* at 272; *see Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990) (describing *Hooper* as "[t]he leading Texas case" in this area); *Curlee*, 112 Tex. 40, 244 S.W. at 498 (quoting *Hooper* at length after declaring that "[t]he correct rules that govern covenants of the character set out in the deeds to this restricted district are well stated . . . in [*Hooper*]"). In other words, where an owner

of a tract subdivides and sells the subdivided parcels to separate grantees, imposing restrictions on the use of each parcel pursuant to a general plan or scheme of development, each grantee may enforce the restrictions against each other grantee. *Lehmann v. Wallace*, 510 S.W.2d 675, 680-81 (Tex. Civ. App.—San Antonio 1974, writ ref'd n.r.e.).

### 2. Standing

Questions about standing are implicated whenever a property owner seeks to enforce such a restrictive covenant. Standing essentially depends on two things: (1) the existence of a general plan or scheme of development (2) that was part of the inducement for purchasers to obtain land within the restricted area:

> The most familiar cases in which courts of equity have upheld the right of owners of land to enforce covenants to which they were not parties are those in which it has appeared that a general building scheme or plan for the development of a tract of land has been adopted, designed to make it more attractive for residential purposes by reason of certain restrictions to be imposed on each of the separate lots sold. This forms an inducement to each purchaser to buy, and it may be assumed that he pays an enhanced price for the property purchased. The agreement therefore enters into and becomes a part of the consideration. The buyer submits to a burden upon his own land because of the fact that a like burden imposed on his neighbor's lot will be beneficial to both lots. The covenant or agreement between the original owner and each purchaser is therefore mutual. The equity in this particular class of action is dependent as much on the existence of the general scheme of improvement or development as on the covenant, and restrictions which contemplate a general building plan for the common benefit of purchasers of lots are recognized and enforced by courts of equity at the instance of the original grantor or subsequent purchasers.

*Hooper*, 171 S.W. at 272; *see also Evans*, 796 S.W.2d at 466 (noting that "the concept of a general plan of development is . . . frequently connected to . . . standing questions"); *Curlee*, 112 Tex. 40, 244 S.W. at 498 ("It was implied in each contract that every other contract should have these same provisions of restrictions, as they were for the benefit of all, and at once formed an inducement to each purchaser.").

The standing of a property owner within a subdivision to enforce a restrictive covenant against another similarly situated property owner does not turn on whether the deed of the owner

against whom enforcement is sought contains the restriction. If the deed of the property owner against whom enforcement of the restriction is sought contains the restriction, standing is based on an implied mutuality of covenants among the various purchasers within the subdivision. *See, e.g.*, *id.*; *Giles*, 697 S.W.2d at 427 (holding that where many property owners are interested in a restrictive covenant, any one of them can sue to enforce it); *Hooper*, 171 S.W. at 272 (standing is predicated on mutuality of covenant between original owner and each purchaser). If, on the other hand, the deed does *not* contain the restriction, standing is based on application of the doctrine of implied negative reciprocal easement. *See, e.g.*, *Evans*, 796 S.W.2d at 466; *Lehmann*, 510 S.W.2d at 681 (standing to enforce restrictive covenant may be based "either upon the theory that there is a mutuality of covenants and consideration, or upon the ground that mutual negative equitable easements are created"). The doctrine of implied reciprocal negative easement applies when a developer sells a substantial number of lots within a subdivision by deeds containing the restrictive covenant, and the party against whom the restriction is sought to be enforced had notice of the restriction but the deed did not actually contain the restriction. *Evans*, 796 S.W.2d at 466.

Importantly, the analysis of whether a general plan or scheme of development exists is the same whether a party is attempting to enforce an express restriction (i.e., one that is contained in the deed of the party against whom enforcement is sought) or seeking application of the doctrine of implied reciprocal negative easement. *Id.*; *Curlee*, 112 Tex. 40, 244 S.W. at 498. The only meaningful difference between the two situations is that the party seeking to enforce an implied negative easement has the additional burden to demonstrate that a "substantial number" of the deeds conveying property within the subdivision contain the restriction. *Evans*, 796 S.W.2d at 466.

**B.       General Principles Applied**

Ski Masters asserts that the Residents do not have standing because there was no overall development plan for the 6.76 acre tract, and even if there was such a plan, it was abandoned. The Residents respond that evidence supports the trial court's findings that Carlson intended a "general plan or scheme" that the 6.76 acre tract be a residential subdivision and that this general plan or scheme has not been abandoned or waived. In analyzing this issue, we are mindful that the existence of a general plan or scheme, and whether such a plan or scheme has been abandoned, are fact issues.

**1.       Evidence of General Plan or Scheme of Development**

The evidence supporting the trial court's finding that a general plan or scheme existed for the Carlson Subdivision is compelling. The Fleming Deed states that "Grantor . . . , by this instrument subjects the remainder of the 6.76 acres of land with these same restrictions, conditions and option, *whether embodied in future instruments of conveyance or not*." (emphasis added) The Fleming Deed also provides that the restrictions renew automatically and can be waived or changed only by vote of the majority of property owners in the Carlson Subdivision, further evidencing a general plan or scheme. *Evans*, 796 S.W.2d at 470.

Ski Masters had notice of the residential-only restriction. *Hooper*, 171 S.W. at 272. Ennis testified that he was aware of the residential-only restriction when he bought the property and admitted that his realtor attempted to have all owners of properties in the Carlson Subdivision sign a waiver of this restriction. Also, a "substantial number" of the lots within the planned development scheme (eight of ten) were conveyed with the restriction at issue. *Evans*, 796 S.W.2d at 466. Finally, there was testimony from the Residents that uniformity of the residential-only restriction within the subdivision was part of their inducement to purchase property in the subdivision. *Hooper*, 171 S.W. at 272.

## 2.  General Scheme or Plan Not Negated as a Matter of Law

Ski Masters argues that, as a matter of law, there was no scheme or plan, noting that (1) Carlson conveyed tracts 2 and 4 without the residential-only restriction, (2) the plat referenced in the restriction was never recorded, and (3) the ten original tracts have been re-subdivided in significant ways.

### (1)  Conveyances by Carlson without the restrictions

The argument that the existence of a general plan or scheme was negated by the conveyance of two tracts without the restriction at issue was raised and rejected in *Hooper*. *Id.* The *Hooper* court noted that uniformity of restrictions and deviation from that uniformity are "evidentiary matter[s] only," and that "[t]here may . . . be departures from the usual restrictions in individual cases without destroying the integrity of the scheme of development as a whole." *Id.* This Court previously explained why lack of complete uniformity of restrictions does not, as a matter of law, preclude a finding of a general scheme or plan:

> [W]here a subdivision has been placed upon the market with a declared intention that it will be developed as a restricted residential district and enhanced values are paid for the lots on this representation, the failure of the developer to include uniform restrictions in all deeds or his failure to include any restrictions in one or more deeds would not of itself take away all of the rights of the other purchasers to have the district maintained as a restricted residential district. [Otherwise,] a subdivider might sell hundreds of lots for enhanced prices, upon the representation that the district was to be a restricted residential district, and then by his failure, either through inadvertence or otherwise, to include such restrictions in one deed, destroy the entire scheme or plan for a restricted residential subdivision. We refrain from making such a holding.

*Bethea v. Lockhart*, 127 S.W.2d 1029, 1031 (Tex. Civ. App.—San Antonio 1939, writ ref'd).

### (2)  Failure to record the plat

Likewise, Carlson's failure to record the plat is not dispositive of the existence of a general scheme or plan.  In *Lehmann*, this Court rejected the argument that, as a matter of law, there can be no general scheme or plan where the plat reflecting the subdivision "is not filed of

record." 510 S.W.2d at 679. The parties seeking to enforce the restrictive covenant in that case, like the Residents here, did not rely exclusively on unrecorded plat, but presented other evidence to establish the existence of general plan or scheme. This evidence included the presence of the restriction in numerous other deeds for properties in the subdivision and reliance by purchasers on the existence of the restrictions for all properties within the subdivision as an inducement to purchase. *Id.* at 680.[1]

### (3)  Redrawing the boundaries within the 6.76-acre tract

Finally, Ski Masters argues that no general scheme or plan could be said to exist at the time it purchased its property because the boundaries of tracts 4 and 5 had been redrawn, and the tract owned by Ski Masters consisted of all of original tract 4, a portion of original tract 5, and other property lying entirely outside the original 6.76 acres. Moreover, the boundaries of other tracts from the original ten had also been redrawn, and the Residents failed to object to any of these "re-drawings." Ski Masters asserts that, as a matter of law, under these circumstances, whatever general plan or scheme might have existed at some point for the ten tracts platted for the original subdivision cannot be said to exist as to its tract.

Ski Masters cites no authority directly supporting this argument, and our research did not reveal any such authority. Ski Masters notes, and we agree, that absent an express covenant that precludes further subdivision, a property owner is free to subdivide her property in any lawful manner as she sees fit. *McDonald v. Painter*, 441 S.W.2d 179, 184-85 (Tex. 1969). This does not, however, mean that such "re-subdivision" negates the existence of a general plan or scheme as a matter of law.

---

[1] Ski Masters argues that none of the deeds after the Fleming Deed contain the residential-only restriction because the references in those deeds to the restrictions "set out and recorded in Volume 311, Page 208 of the Guadalupe County deed records [i.e., the Fleming Deed]" are merely limits on Carlson's potential liability for breach of warranty. This argument is without merit. *See Bethea*, 127 S.W.2d at 1030 (enforcing restrictive covenant against party whose deed "incorporated restrictions to the effect that the property was to be used for residence purposes only" by reference to volume and page numbers of other recorded instruments).

Whether a general plan or scheme of development exists is a fact question, and some evidence supports the trial court's finding that such a scheme exists. *Hooper*, 171 S.W. at 272; *see also* RESTATEMENT (THIRD) OF PROPERTY: SERVITUDES § 2.14 cmt. f (2000) ("Existence of a general plan is a question of fact to be determined from the circumstances."). Significantly, Andrew Eastwood, the person who received the initial conveyance of tract 4 by a deed with no restrictions, accomplished the "re-subdivision" that Ski Masters relies on in asserting that the general plan or scheme was negated. Before selling tract 4, Eastwood acquired that part of tract 5 that is now part of the "new" tract 4 (owned by Ski Masters).[2] When Eastwood sold "new" tract 4, he included in the deed the very same restrictions that burdened all but one of the other original grantees of tracts in the Carlson Subdivision, and he did so by referencing the Fleming Deed by volume and page number, just as was done in the other deeds.

A reasonable inference to be drawn from this evidence is that Eastwood was aware of the residential-only restrictions and intended his property to be burdened like all other properties within the general plan or scheme. It can also be reasonably inferred from this evidence that Carlson's omission of the restriction from Eastwood's deed was not an expression about the general plan or scheme, but perhaps was an oversight. Accordingly, Eastwood's "re-subdivision" of tract 4 does not negate the existence of the general plan or scheme as a matter of law.

Moreover, the Residents presented evidence that they purchased property within the subdivision based in part on the residential-only restriction. *Hooper*, 171 S.W. at 272. The fact that many years had elapsed since their purchases and that some of the tracts had redrawn boundaries does not alter the Residents' reliance on the restriction at the time of their purchases.

---

[2] Eastwood did not sell the tract to Ski Masters; there were other owners of the tract between Eastwood and Ski Masters in the chain of title.

Accordingly, the trial court did not err in concluding that Ski Masters' property is bound by the residential-only restriction.

### 3. Abandonment

Alternatively, Ski Masters asserts that the general plan or scheme was "abandoned" and is, therefore, no longer binding on it or any other property owner in the Carlson Subdivision. Abandonment occurs when there are "substantial violations within the restricted area." *Cowling v. Colligan*, 312 S.W.2d 943, 945 (Tex. 1958). Ski Masters had the burden of proof to demonstrate that the general scheme was abandoned. *Giles*, 697 S.W.2d at 427. To meet this burden, Ski Masters had to prove that the violations of the restriction were "so great as to lead the mind of the 'average man' to reasonably conclude that the restriction . . . has been abandoned and its enforcement waived." *Oldfield v. City of Houston*, 15 S.W.3d 219, 226-27 (Tex. App.— Houston [14th Dist.] 2000, pet. denied) (superseded by statute on other grounds).

In support of its abandonment theory, Ski Masters points to the facts that Carlson did not record the plat and sold two of the ten properties without the residential-only restriction. We have already rejected the argument that these facts alone can negate the existence of a general plan or scheme. The only other evidence presented by Ski Masters on the issue of abandonment was that one of the Residents appeared to be using his property for business purposes. Three of the property owners testified, however, that there has been no non-residential use of any property in the subdivision, and the property owner alleged to have conducted business on his subdivision property testified without contradiction that his use of the property was for personal purposes only. Thus, there is some evidence supporting the trial court's conclusion that there was no abandonment of the general scheme of development.

**C.** **Inconsistent Findings and Conclusions**

Ski Masters also asserts on appeal that where express restrictions exist, an implied reciprocal negative easement cannot. *Owens*, 241 S.W.3d at 131. According to Ski Masters, the trial court's conclusion that the Ski Masters tract is burdened with an express restrictive covenant cannot be reconciled with its conclusion of law that the tract is the subject of an implied reciprocal negative easement, and these contradicting conclusions of law cannot stand. *Id.*

The Austin Court of Appeals recently held that "an implied reciprocal negative easement cannot arise where, as here, the subject property was sold with express restrictions that are the same as those allegedly implied." *Id.* This holding, however, is limited to its context. In *Owens*, the property at issue was directly burdened by a restrictive covenant that, by its terms, was to last twenty-five years unless renewed by a majority of the property owners. *Id.* at 129-30. The property owners did not renew the restriction until two years after its expiration. *Id.* at 130. Because this was not timely, the restrictive covenant had expired and could not be enforced. *Id.* The court refused to imply a covenant where the grantor had made express restrictions. *Id.* at 131. Because the grantor intended a twenty-five-year restriction that expired if not renewed, and the restriction was not renewed, an implied restriction under these circumstances would be contrary to the will of the grantor.

Here, the grantor expressed the converse intent – that the residential-only restriction would renew automatically if not expressly waived by a majority of the property owners. Ski Masters' realtor unsuccessfully sought such a waiver from the property owners. Under these circumstances, it would be contrary to the will of the grantor to refuse to imply a restrictive covenant because there is an express covenant in Ski Masters' chain of title.

Moreover, Ski Masters' argument disregards that the Residents pled the doctrine of implied reciprocal negative easement as an alternative basis for relief. Even assuming that the

trial court erred in finding that the property was burdened both expressly and impliedly, such an error is not reversible because some evidence supports the trial court's judgment enforcing the residential-only restriction against Ski Masters. *Lifshutz*, 199 S.W.3d at 17 ("Incorrect conclusions of law will not require a reversal if the controlling findings of fact will support the judgment under a correct legal theory.").

## D.    Attorneys' Fees

Finally, Ski Masters challenges the award of trial and appellate attorneys' fees to the Residents. Under section 5.006 of the Texas Property Code, "[i]n an action based on breach of a restrictive covenant pertaining to real property, the court shall allow to a prevailing party who asserted the action reasonable attorney's fees in addition to the party's costs and claim." TEX. PROP. CODE ANN. § 5.006 (Vernon 2003). This statute is mandatory; a court has no discretion to not award fees to a prevailing party. *Gorman v. Countrywood Prop. Owners Ass'n*, 1 S.W.3d 915, 918 (Tex. App.—Beaumont 1999, pet. denied).

Ski Masters does not contest the reasonableness of the amount of fees awarded or the sufficiency of the evidence to support the fee awards. Ski Masters's only contention is that, because the trial court's judgment on the restrictive covenant issue should be reversed, the attorneys' fees awards should likewise be reversed. Because we affirm the judgment, we also affirm the award of attorneys' fees. TEX. PROP. CODE § 5.006.[3]

### CONCLUSION

The trial court found that a general scheme of development existed for the Carlson Subdivision, and that Ski Masters' property was bound by the residential-only restriction

---

[3] Ski Masters noted (without citation or argument) in its Brief of the Appellants that the trial court erred in not conditioning the appellate attorneys' fees award on the Residents' success on appeal. "[A]ny award of attorney's fees on appeal must be conditioned on the receiving party's success." *Westech Eng'g, Inc. v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 205 (Tex. App.—Austin 1992, no writ). Because the Residents succeeded on appeal, any error in this portion of the judgment is harmless. *See ASAI v. Vanco Insulation Abatement, Inc.*, 932 S.W.2d 118, 123 n.3 (Tex. App.—El Paso 1996, no writ).

characterizing this scheme. From this, the trial court concluded that the Residents had standing to enforce the residential-only restriction and entered a judgment enjoining Ski Masters from violating that restriction. Some evidence supports the trial court's findings, and the trial court committed no legal error warranting reversal.

Accordingly, the judgment of the trial court is affirmed.


Rebecca Simmons, Justice