**Opinion issued September 4, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00069-CV

————————————

**CLAY JEANSONNE AND DONNA JEANSONNE, Appellants**

**V.**

**T-MOBILE WEST CORPORATION, Appellee**

**On Appeal from the 164th District Court**
**Harris County, Texas**
**Trial Court Case No. 2011-36355**

## MEMORANDUM OPINION

In this case, homeowners sued a wireless communications company after the

company built a cell phone tower on property adjacent to the homeowners'

subdivision. The trial court granted summary judgment in favor of the wireless

communications company on the homeowners' breach of restrictive covenants and nuisance claims, and this appeal followed. We affirm.

## BACKGROUND

### LOE Conveys Property to CFISD with Restrictive Covenants

Lakes of Eldridge, Ltd. ["LOE"] owned several hundred acres of land in Harris County and, on November 2, 1995, it conveyed 9.49 acres to Cy Fair Independent School District ["CFISD"]. The legal description of the tract is as follows:

> TRACT 1-9.4929 acres, more or less, situated in the August Thonig Survey, Abstract No. 1037, Harris County, Texas and being more particularly described in Exhibit "A" which is attached hereto and incorporated herein for all purposes.

[hereinafter, "the Cy-Fair Property"]. The Deed transferring the property to CFISD also incorporated "[t]he Lakes on Eldridge, Ltd. Protective Covenants recorded under Clerk's File No. R658404 of the Real Property Records of Harris County, Texas," the preamble of which provides:

> That LAKES ON ELDRIDGE, LTD., a Texas limited partnership, desiring, as the owner of the Cy-Fair Property, to adopt a plan for the orderly development of the Cy-Fair Property, does hereby impose upon the Cy-Fair Property the following covenants, restrictions, easements and liens . . . which shall run with the land and be binding upon any Owner, Lessee, tenant or mortgagee of any land or building in the Cy-Fair Property . . . .

The restrictive covenants provide that "[t]he Cy-Fair Property shall be used for an elementary school" and that "[n]o alternative use will be permitted, without the

2

prior written approval of Lakes on Eldridge or as set out herein in Article VI."

Also, the restrictions provide that

> [a]ll pipes, conduits, cable, line or other facilities for water, gas, sewage, stream, electricity, telephone, television, or any other energy or service serving any Parcel from any main trunk line or easement (collectively, "Utilities") shall be installed and maintained below ground, unless otherwise approved by Lakes on Eldridge.

Regarding enforcement of the covenants, the document provides:

> These Protective Covenants shall run with and bind the land within the Cy-Fair Property, and (except where expressly provided otherwise) shall inure to the benefit of and be enforceable by Lakes on Eldridge or an Owner or Lessee of any land now or hereafter made subject to these Protective Covenants. No tenant or mortgagee (while a mortgagee) or other person or entity shall have any right to enforce these Protective Covenants. The failure of any party to take action upon any breach or default of these Protective Covenants shall not be deemed a waiver of the right to take enforcement action upon any subsequent breach or default.

After acquiring the Cy-Fair Property, CFISD built Kirk Elementary School at that location.

**The Jeansonnes Live in an Adjacent Neighborhood**

With the remainder of its property, LOE created the Lakes on Eldridge Subdivision, which does not include the Cy-Fair Property. The subdivision is subject to its own "Declaration of Covenants, Conditions, & Restrictions," which are filed at Harris County Clerk's File No. R227788. These restrictions require that the sole permitted use of the properties sold therein is for "single-family

3

residential dwelling purposes only . . . ."  The Cy-Fair Property is not covered by these restrictions.

LOE sold a lot in Lakes on Eldridge Subdivision to Village Builders, who sold a completed residential home to Clay and Donna Jeansonne on March 3, 1998. The Jeansonnes' backyard is across a residential street from a parking lot located near the rear of the Cy-Fair Property.

**CFISD Leases a Portion of the Cy-Fair Property to T-Mobile for Construction of a Cell Phone Tower**

In March 2010, CFISD entered into a lease agreement with T-Mobile West Corporation ["T-Mobile"] that permitted T-Mobile to build a concealed telecommunications tower on the Cy-Fair Property, which T-Mobile completed after a 7-10 day construction period in March 2010.  The cell phone tower is located near some of the school's buildings, and is at least 150 feet from the rear of the Jeansonnes' property.  Between their back fence and the cell tower is Summerland Ridge Lane, a sidewalk, some trees and bushes, a fence, and a parking lot.

**The Jeansonnes Sue T-Mobile and the Trial Court Grants Summary Judgments for T-Mobile**

On June 17, 2011, the Jeansonnes sued T-Mobile, alleging (1) that T-Mobile breached the applicable restrictive covenants, and (2) that the structure built on CFISD's land was a private nuisance.  T-Mobile filed a traditional motion for

4

summary judgment on the Jeansonnes' breach of restrictive covenants claim asserting that the Jeansonnes had no standing to raise such a claim. On January 13, 2013, the trial court granted the motion and dismissed the Jeansonnes' claims for breach of restrictive covenant. T-Mobile then filed a traditional motion for summary judgment on the Jeansonnes' nuisance claims, which were based on aesthetics and radio-frequency emissions. The trial court granted summary judgments as to the nuisance claims based on radio-frequency emissions, but denied summary judgment as to the aesthetics nuisance claim. After further depositions to explore the possible bases for the Jeansonnes' nuisance claim, T-Mobile moved for traditional and no-evidence summary judgment, contending that the only "nuisance" asserted by the Jeansonnes was aesthetic, which, standing alone, is not actionable. The trial court agreed, granting T-Mobile's traditional and no-evidence motions for summary judgment and entering a final judgment.

This appeal followed.

## PROPRIETY OF SUMMARY JUDGMENTS

In two issues on appeal, the Jeansonnes contend the trial court erred in granting summary judgment on its breach of restrictive covenant and nuisance claims.

**Standard of Review**

We review a trial court's grant of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). The party moving for summary judgment bears the burden of proof. *Roskey v. Tex. Health Facilities Comm'n*, 639 S.W.2d 302, 303 (Tex. 1982). Though these burdens vary for traditional and no-evidence motions, the summary judgment motions here were a traditional and a hybrid motion, to which both parties attached and referred to summary judgment evidence; therefore, the differing burdens are immaterial and the ultimate issue is whether a fact issue exists. *Buck v. Palmer*, 381 S.W.3d 525, 527 & n.2 (Tex. 2012). A fact issue exists if there is more than a scintilla of probative evidence. *See id.* at 527; TEX. R. CIV. P. 166a(c), (i). We must review the summary judgment record "in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion." *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005). "In reviewing a summary judgment, we consider all grounds presented to the trial court and preserved on appeal in the interest of judicial economy." *Diversicare Gen. Partner, Inc. v. Rubio*, 185 S.W.3d 842, 846 (Tex. 2005).

**Restrictive Covenants—Standing**

In their first issue on appeal, the Jeansonnes contend the trial court erred in granting T-Mobile's summary judgment on the restrictive covenant claims.

Specifically, the Jeansonnes contend that they have standing to enforce the restrictive covenants on the Cy-Fair Property, despite having no property in that area, because they are entitled to assert an equitable servitude. T-Mobile responds that, as non-parties to the restrictive covenants who are not successors, assigns, owners, or lessees of the restricted property and do not own property within the restricted area, the Jeansonnes have no standing to enforce the restrictive covenants. Similarly, T-Mobile contends that the Jeansonnes have no right to enforce the covenants by way of an equitable servitude.

Standing is a legal question reviewed de novo. *Myer v. Cuevas*, 119 S.W.3d 830, 833 (Tex. App.—San Antonio 2003, no pet.). The test for standing is whether there is "(1) a real controversy between the parties (2) that will be actually determined by the judicial declaration sought."*Antonov v. Walters*, 168 S.W.3d 901, 904 (Tex. App.—Fort Worth 2005, pet. denied).

We consider whether the Jeansonnes have standing either (a) under the terms of the restrictive covenants, or (b) pursuant to the doctrine of equitable servitude.

*(A) Under the Terms of the Restrictive Covenant*

A restrictive covenant is a contractual agreement between the seller and the purchaser of real property. *Ski Masters of Tex., LLC v. Heinemeyer*, 269 S.W.3d 662, 667 (Tex. App.—San Antonio 2008, no pet.). When construing a restrictive covenant, appellate courts apply general rules of contract construction. *Pilarcik v.*

7

*Emmons*, 966 S.W.2d 474, 478 (Tex.1998); *Ski Masters,* 269 S.W.3d at 668. Covenants are examined as a whole in light of the circumstances present when the parties entered into the agreement. *Ski Masters*, 269 S.W.3d at 667. The reviewing court's primary concern is to ascertain and give effect to the true intention of the parties as expressed in the instruments. *Owens v. Ousey*, 241 S.W.3d 124, 129 (Tex. App.—Austin 2007, pet. denied). A trial court's construction of a restrictive covenant is reviewed de novo. *Id.*

The restrictive covenants at issue here apply exclusively to the Cy-Fair Property, i.e., the property that LOE sold to CFISD. The deed conveying the 9.49 acres to CFISD incorporated the restrictive covenants, which "does hereby impose upon the Cy-Fair Property the following covenants, restrictions, easements and liens . . . which shall run with the land and be binding upon any Owner, Lessee, tenant or mortgagee of any land or building in the Cy-Fair Property . . . ," including the restrictions on use as an elementary school and telephone utilities above the ground. The record is undisputed that the Jeansonnes' property is not within the Cy-Fair Property, but is across the street in an adjoining subdivision that is covered by its own separate restrictive covenants.

The restrictive covenants also state that they shall "inure to the benefit of [LOE] or an Owner or Lessee of any land now or hereafter made subject to these Protective Covenants[,]" and "shall . . . be enforceable by [LOA] or any Owner or

8

Lessee of any land now or hereafter made subject to these Protective Covenants," and "[n]o tenant or mortgagee (while a mortgagee) or other person or entity shall have any right to enforce these Protective Covenants."

The Jeansonnes, who do not own property within the area covered by the covenants, and who are neither owners, tenants, mortgagee, or assigns of either LOA or CFISD, have no standing *under the provisions of the restrictive covenants* to bring an action to enforce them.

*(B) Under the Doctrine of Equitable Servitude*

Nevertheless, the Jeansonnes contend that they have standing to enforce the restrictions under the doctrine of equitable servitude because the covenant was intended to benefit their adjoining land.

In ordinary circumstances, a restrictive covenant is enforceable only by the contracting parties and those in direct privity of estate with the contracting parties. *Ski Masters*, 269 S.W.3d at 668; *see*, *e.g.*, *Davis v. Skipper*, 83 S.W.2d 318, 321–22 (Tex. 1935); *Wayne Harwell Props., v. Pan Am. Logistics Ctr., Inc.*, 945 S.W.2d 216, 218 (Tex. App.—San Antonio 1997, writ denied). As we stated earlier, the Jeansonnes are neither contracting parties, nor are they in privity with the contracting parties, LOE and CFISD.

However, an exception exists whereby a restrictive covenant may be enforced by someone other than the grantor or grantee. *Ski Masters*, 269 S.W.3d at

9

668. A property owner may subdivide property into lots and create a subdivision in which all property owners agree to the same or similar restrictive covenants designed to further the owner's general plan or scheme of development. *Id.* Under these circumstances, each purchaser within the subdivision is assumed to benefit from the restrictions and each has the right to enforce the restrictions. *Id.*; *see, e.g., Curlee v. Walker*, 244 S.W. 497, 498 (Tex. 1922) ("It is perfectly clear that it is lawful for districts with restrictions [designed to benefit all property owners] to be created, and also that each purchaser has the right to rely on and to enforce those restrictions.").

In *Hooper v. Lottman*, 171 S.W. 270 (Tex. Civ. App.—El Paso 1914, no writ), the court described the rationale for allowing homeowners to enforce restrictive covenants against similarly situated homeowners as follows:

> [T]he general rule may be safely stated to be that where there is a general plan or scheme adopted by the owner of a tract, for the development and improvement of the property by which it is divided into streets and lots, and which contemplates a restriction as to the uses to which lots may be put, or the character and location of improvements thereon, to be secured by a covenant embodying the restriction to be inserted in the deeds to purchasers, and it appears from the language of the deed itself, construed in the light of the surrounding circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject thereto, and to have the benefit thereof, and such covenants are inserted in all the deeds for lots sold in pursuance of the plan, a purchaser and his assigns may enforce the covenant against any other purchaser, and his assigns, if he has bought with actual or constructive knowledge of the scheme, and the covenant was part of the subject-matter of his purchase.

10

*Id.* at 272; *see Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990). In other words, when an owner of a tract subdivides and sells the subdivided parcels to separate grantees, imposing restrictions on the use of each parcel pursuant to a general plan or scheme of development, each grantee may enforce the restrictions against each other grantee. *Ski Masters*, 269 S.W.3d at 669; *Lehmann v. Wallace*, 510 S.W.2d 675, 680–81 (Tex. Civ. App.—San Antonio 1974, writ ref'd n.r.e.).

However, "it is well settled that a restriction on a piece of property may not be enforced by one who owns land not subject to the restriction, absent privity of contract or a general play or scheme of development applicable to the land that the plaintiff does own. *County Community Timberland Village, L.P., v. HMW Special Utility District of Harris and Montgomery Counties*, __S.W.3d.__, 2014 WL 1478009, at *5 (Tex. App.—Houston [1st Dist.] Apr. 15, 2014, no pet. h.) (citing *Wasson Interests, Ltd. v. Adams*, 405 S.W.3d 971, 974 (Tex. App.—Tyler 2013, no pet.)). A restrictive covenant is not enforceable solely due to a common source of title, but requires either privity of contract or a general plan or scheme of development. *Wasson Interests*, 405 S.W.3d at 974.

To establish a general plan or scheme or development, the party seeking to enforce the restriction must show (1) that a common grantor (2) developed a tract of land (3) for sale in lots and (4) pursued a course of conduct that indicates he

11

intends to inaugurate a general scheme or plan of development (5) for the benefit of himself and the purchasers of various lots, and (6) by numerous conveyances (7) inserts in the deeds substantially uniform restrictions, conditions and covenants against the use of the property. *Country Community Timberland Village*, 2014 WL 1478009, at *5 (citing *Evans v. Pollock*, 796 S.W.2d 465, 466 (Tex. 1990) and *Minner v. City of Lynchburg*, 204 Va. 180, 129 S.E.2d 673, 679 (1963)). When these conditions are satisfied, "the grantees acquire by implication an equitable right, variously referred to as an implied reciprocal negative easement or an equitable servitude to enforce similar restrictions against that part of the tract retained by the grantor or subsequently sold without the restrictions to a purchaser with actual or constructive notice of the restrictions." *Evans*, 796 S.W.2d at 466 (quoting *Minner*, 129 S.E.2d at 679).

In *Country Community Timberland Village*, this Court considered whether homeowners seeking to enforce restrictions on a nearby tract of land had established the existence or a general plan or scheme necessary to give them standing. 2014 WL 1478009, at *7. In that case, a developer had subdivided a 143.5 tract of land that became Timberlake Village Subdivision. *Id.* at *1. It also owned a smaller 3.93 acre piece of property that was not subdivided, referred to as the Small Tract. *Id.* Timberlake Village and the Small Tract each had its own covenants, conditions, and restrictions, which were in separate documents. *Id.*

12

The Small Tract's declarations included a restriction for residential purposes only. *Id.* at \*2. Subsequently, a Texas water district purchased a portion of the Small Tract on which it planned to build a water plant. *Id.* Because its plans violated the residential-use-only provision of the Small Tract's Declarations, the water district sought to condemn the restriction as it applied to the property it had purchased. *Id.* The developer and several homeowners of Timberlake Village sought to recover a portion of the condemnation award. *Id.* On appeal, this Court considered whether the homeowners and developer had standing to recover damages for the condemnation of deed restrictions on property in which they held no property interest. *Id.* at \*3.

First, this Court held that to establish a general plan or scheme applicable to both the subdivision and the Small Tract, the developer and homeowners had the burden to show that the developer had "develop[ed] a tract of land for sale in lots . . . and by numerous conveyances insert[ed] in the deeds substantially uniform restrictions conditions and covenants against the use of the property." *Id.* at \*7 (quoting *Evans*, 796 S.W.2d at 466). The Court concluded that the developer and homeowners had failed to meet this burden, stating

> [t]he pleadings and evidence at trial established the opposite of these elements of a general plan or scheme. [The developer] did not develop "a tract of land," but two tracts of land. One such tract, the Small Tract, was never subdivided into lots. And, the restrictions, conditions, and covenants governing the Small Tract and the

13

subdivision were not "substantially uniform" but differed in many respects.

*Id.* The same is true in this case. Here, LOE created and developed two tracts of land, each governed by its own restrictions, conditions, and covenants. And, as in *Country Community Timberland Village*, the declarations on the smaller tract adjacent to the subdivision—here, the Cy-Fair Property—give the right to enforce the covenants only to "Lakes on Eldridge [the developer] or an Owner or Lessee of any land now of hereafter made subject to these [Cy-Fair Property] Protective Covenants." *See id.* at *6 ("The Small Tract Declaration gives only owners of the Small Tract or a portion thereof the power to enforce the restrictions applicable to the Small Tract."). Indeed, the Cy-Fair covenants further provide that "No . . . other person or entity shall have any right to enforce these Protective Covenants."

Because the Cy-Fair covenants imposed restrictions on only one piece of property, and not on the property owned by the residents of the Lakes on Eldridge Subdivision, there is no evidence of a general plan or scheme of development covering only the restricted land. *See id.* at *7; *see also Evans*, 796 S.W.2d at 472 & n.2 (noting that when larger tract is subdivided in stages, separate subdivisions are created with restrictions benefiting and burdening only land of each particular subdivision).

Second, this Court in *Country Community Timberland Village* considered whether, despite the absence of a general plan or scheme, the homeowners of the

14

subdivision had standing to sue because "the restriction [in the Small Tract] declarations was intended for the benefit of the owners in the subdivision." 2014 WL 1478009, at *7. In that case, the recitals in the declarations applicable to the Small Tract provided that the developer "desires to subject the [Small Tract] Property to the . . . restrictions hereinafter set forth, for the benefit of the owners of the Property and for the benefit of the owners of property located within Timberlake Village [subdivision]." *Id.* at *8 (emphasis omitted). However, the operative provisions of the Small Tract declarations made no mention of the property in the subdivision or its owners. *Id.* This Court then held that "whatever the grantor's motivation, the plain language of the Small Tract Declaration created property rights only with respect to owners of the Small Tract or portions thereof." *Id.* The absence of any mention of the subdivision's property owners raised a presumption that the Small Tract Declarations did not intend to confer a legal benefit on them. *Id.* Thus, the Court concluded that "[t]he recitals, which reflect the intent to benefit property owners within [the subdivision] cannot control the operative clauses of the Small Tract Declaration." *Id.*

In this case, there is no language, even in the non-operative recitals of the Cy-Fair restrictions, of an express intent to benefit the homeowners of the Lakes

15

on Eldridge Subdivision.[1] And, like *Country Community Timberland Village*, the operative provisions specifically provide that the restrictions "shall inure to the benefit of and be enforceable by Lakes on Eldridge [the developer] or an Owner or Lessee of any land now or hereafter made subject to these [Cy-Fair Property] Protective Covenants[,] and that "[n]o . . . other person or entity shall have any right to enforce these Protective Covenants." When a document's enforcement clause unambiguously provides who may enforce a deed restriction, we cannot enlarge that power or vest power in individuals not named. *See id*.

Because the Jeansonnes have failed to show a general plan or scheme of development or that the Cy-Fair restrictions were intended for their benefit, we—like the Court in *Country Community Timberland Village*—conclude that they have no standing to enforce the restrictions found in the Cy-Fair Property's restrictive covenants. Our holding is consistent with Texas cases refusing to permit landowners the right to enforce restrictive covenants on another's property absent privity of contract or a showing that both parcels of property are subject to a

---

[1]    Some of the Cy-Fair restrictions require property owners in the restricted property to repair damages caused during construction to any sidewalk, easement, utility or improvement in the neighboring subdivision, or to refrain from shining spotlights at any residence adjoining the Cy-Fair Property. However, none of those specific references to the subdivision are applicable here, and their specific nature does not give rise to a general intent to "benefit" the subdivision by applying all the provisions in the Cy-Fair restrictions, such as the "school-use" only restriction at issue here.

common, general plan or scheme of development. *See Country Community Timberlake Village*, 2014 WL 1478009, \*8-9 (holding that despite common grantor, homeowners of subdivision had no standing to enforce restrictions on adjoining property absent privity or general plan of development); *Wasson Interests*, 405 S.W.3d at 974 (restrictive covenant is enforceable solely due to common source of title, but requires privity of contract or general plan or development scheme); *Sills v. Excel Servs., Inc.*, 617 S.W.2d 280, 284 (Tex. App.—Tyler 1981, no writ) (tract outside of subdivision not subject to restrictive covenants imposed on subdivision); *Nelson v. Flache*, 487 S.W.2d 843, 846 (Tex. App.—Amarillo 1972, writ ref'd n.r.e.) ("It is well settled that property owners of one subdivision of an addition have no standing to enforce the restrictive covenants applicable to separate and distinct subdivisions." (citation omitted)); *Jobe v. Watkins*, 458 S.W.2d 945, 948 (Tex. App.—Fort Worth 1970, writ ref'd n.r.e.) ("property owners in one subdivision of an addition have no standing in court to enforce deed restrictions imposed on property located in a separate and distinct subdivision"); *Moody v. City of Univ. Park*, 278 S.W.2d 912, 923 (Tex. App.—Dallas 1955, writ ref'd n.r.e.) ("Property owners in another subdivision have no standing to enforce deed restrictions imposed upon property in a separate and distinct subdivision."); *Russell Realty Co. v. Hall*, 233 S.W. 996, 999 (Tex. Civ. App.—Dallas 1921, writ dism'd w.o.j.) (when developer subdivides single parcel

17

of land by filing two plats, imposing deed restrictions on first section, buyers of lots in second section had no standing to enforce deed restrictions on first section).

Accordingly, the trial court did not err in granting T-Mobile's motion for summary judgment on the Jeansonnes' breach of restrictive covenant claim because of their lack of standing.

We overrule the Jeansonnes' first issue on appeal.

**Nuisance**

In their second issue on appeal, the Jeansonnes contend the trial court erred in granting summary judgment on their private nuisance claims.

*(A) Law Applicable to Nuisance*

A "nuisance" is "a condition that substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities." *Schneider Nat'l Carriers, Inc. v. Bates*, 147 S.W.3d 264, 269 (Tex. 2004). Nuisance claims are frequently described as a "non-trespassory invasion of another's interest in the use and enjoyment of land." *GTE Mobilnet of S. Tex. Ltd. P'ship v. Pascouet*, 61 S.W.3d 599, 615 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

A private-nuisance claim may arise when property is used in a way that offends the neighbors' senses; thus, foul odors, noise, and bright lights—if sufficiently extreme—may constitute a private nuisance. *Schneider Nat'l Carriers*,

18

147 S.W.3d at 269. Most nuisance actions involve an invasion of a plaintiff's property by light, sound, odor, or foreign substance. In *Pascouet*, the court held that floodlights that shined into the plaintiffs' backyard all night and noisy air conditioners that interfered with normal conversation in the backyard, could be heard indoors, and interrupted plaintiffs' sleep constituted a nuisance. 61 S.W.3d at 616. In *Lamesa Coop. Gin v. Peltier*, 342 S.W.2d 613, 616 (Tex. Civ. App.—Eastland 1961, writ ref'd n.r.e.), the court held that a cotton gin was a nuisance because of its loud noises and bright lights that could be seen and heard on plaintiff's property and because of the dust, lint, and cotton burrs that were carried to the plaintiff's property.

However, Texas courts have not found a nuisance merely because of aesthetic-based complaints. For example, in *Rankin v. FPL Energy, LLC*, 266 S.W.3d 506, 507 (Tex. App.—Eastland 2008, pet. denied), the plaintiff sued alleging that a wind farm on nearby property was a nuisance. The defendant moved for summary judgment as to plaintiff's claims that were based "in whole or in part of the basis of any alleged aesthetic impact of [the defendant's] activities," which the trial court granted. *Id.* at 508. The plaintiffs responded to summary judgment by presenting evidence from the plaintiff that carried a consistent theme, i.e., that "the presence of numerous 400-foot-tall wind turbines has permanently and significantly diminished the area's scenic beauty and, with it, the enjoyment of

19

their property." *Id.* at 511. The court noted that plaintiff's nuisance claims were "because of [their] emotional response to the loss of their view due to the presence of numerous wind turbines substantially interfer[ing] with the use and enjoyment of their property." *Id.* In holding that such aesthetically-based claims were not actionable, the court noted:

> We do not minimize the impact of [defendant's] wind farm by characterizing it as an emotional reaction. Unobstructed sunsets, panoramic landscapes, and starlit skies have inspired countless artists and authors and have brought great pleasure to those fortunate enough to live in scenic rural settings. The loss of this view has undoubtedly impacted Plaintiffs. A landowner's view, however, is largely defined by what his neighbors are utilizing their property for. Texas caselaw recognizes few restrictions on the lawful use of property. If Plaintiffs have the right to bring a nuisance action because a neighbor's lawful activity substantially interferes with their view, they have, in effect, the right to zone the surrounding property. Conversely, we realize that Plaintiffs produced evidence that the wind farm will harm neighboring property values and that it has restricted the uses they can make of their property. [Defendant's] development, therefore, could be characterized as a condemnation without the obligation to pay damages.
>
> Texas caselaw has balanced these conflicting interests by limiting a nuisance action when the challenged activity is lawful to instances in which the activity results in some invasion of the plaintiff's property and by not allowing recovery for emotional reaction alone. Altering this balance by recognizing a new cause of action for aesthetical impact causing an emotional injury is beyond the purview of an intermediate appellate court. Alternatively, allowing Plaintiffs to include aesthetics as a condition in connection with other forms of interference is a distinction without a difference. Aesthetical impact either is or is not a substantial interference with the use and enjoyment of land.

> *Id.* at 512.

20

Similarly, in *Shamburger v. Scheurrer*, 198 S.W. 1069 (Tex. Civ. App.—Fort Worth 1917, no writ), the defendant began construction of a lumberyard in a residential neighborhood, and neighboring homeowners sued, alleging that the lumberyard would be "unsightly, unseemly, and have ugly buildings and structures." *Id.* at 1070. The court held that this did not constitute a nuisance, noting that:

> The injury or annoyance which warrants relief against an alleged nuisance must be of a real and substantial character, and such as impairs the ordinary enjoyment, physically, of the property within its sphere; for if the injury or inconvenience be merely theoretical, or if it be slight or trivial, or fanciful, or one of mere delicacy or fastidiousness, there is no nuisance in a legal sense. Thus the law will not declare a thing a nuisance because it is unsightly or disfigured, because it is not in a proper or suitable condition, or because it is unpleasant to the eye and a violation of the rules of propriety and good taste, for the law does not cater to men's tastes or consult their convenience merely, but only guards and upholds their material rights, and shields them from unwarrantable invasion.

*Id.* at 1071–72. In *Dallas Land & Loan Co. v. Garrett*, 276 S.W. 471, 474 (Tex. Civ. App.—Dallas 1925, no writ), the court found that a garage being built for residents of an apartment complex was not a nuisance because "[m]atters that annoy by being disagreeable, unsightly, and undesirable are not nuisances simply because they may to some extent affect the value of property." In *Jones v. Highland Mem'l Park*, 242 S.W.2d 250, 253 (Tex. Civ. App.—San Antonio 1951, no writ), the court held that the construction of a cemetery on adjacent property did

21

not constitute a nuisance, noting: "However cheerless or disagreeable the view of the cemetery in question may be to appellees, and no matter what unpleasant or melancholy thoughts the same may awaken, no reason is thereby shown why appellants should be restrained from making such use of their property." Most recently, in *Ladd v. Silver Star I Power Partners, LLC.*, No. 11-11-00188-CV, 2013 WL 3377290 (Tex. App—Eastland May 16, 2013, no pet.) (mem. op.), the court of appeals, following *Rankin*, held that a plaintiff's nuisance claims against a neighboring wind farm were not actionable "because as a matter of law aesthetic impact will not support a claim for nuisance, [and] the trial court did not err when it considered and granted [the defendant's] motion for summary judgment as to [plaintiff's] visual nuisance claim." *Id.* at \*3.

*(B) Analysis*

The Jeansonnes' Third Amended Petition provides as follows:

19. Defendant's conduct resulted in a Cell Tower which substantially interferes with the Plaintiff's private use and enjoyment of their home and intrudes on their solitude and seclusion in a way that is unreasonable and offensive to a reasonable person similarly situation.

20. As a proximate cause of the interference by Defendant Plaintiff's have suffered damages.

21. Defendant's interference with and invasion of Plaintiff's property caused injury to Plaintiffs, which resulted in the following damages:
   a. permanent depreciation in market value of Plaintiff's property.

22

b. emotional harm to Plaintiffs and their family from the deprivation of the full enjoyment of their property including loss of peace of mind
c. physical harm to Plaintiffs including assault to their senses.

During discovery, T-Mobile questioned the Jeansonnes about the basis for this nuisance claim, and three possible grounds were revealed: (1) alleged potential radio frequency emissions caused by the cell phone tower, (2) construction activity during the 7-10 days of construction, and (3) the alleged unsightliness of the cell phone tower. Of these potential nuisance claims, the Jeansonnes' brief mentions only the third. There is no issue attacking the trial court's grant of partial summary judgment on their nuisance claims, which were based on radio-frequency emissions. And, the Jeansonnes' brief raises no issue, nor even mentions, any nuisance as a result of construction activities. Thus, those issues are waived. *See* TEX. R. APP. P. 38.1(f). Additionally, the Jeansonnes' deposition testimony, as well as that of their real estate export, was there was no damage caused as a result of the brief construction period.

Instead, the Jeansonnes argue that they did not plead aesthetic nuisance, and that a jury should have been allowed to "hear all the testimony to make a determination whether Defendant's actions are nuisance as defined above." Specifically, the Jeansonnes argue that Clay Jeansonne's affidavit, which was attached to their response, raises a fact issue regarding nuisance. In his affidavit, Jeansonne asserts in relevant part:

23

The Cell Tower which has been constructed by Defendant on the premises of Kirk [E]lementary School is at least 50 foot in height and within 50 yards of my home. The construction work on the cell tower was permitted to continue into the late hours of the evening keeping me and my family from sleeping. Diesel fumes and noises from the heavy construction equipment were overwhelming in our back yard making it impossible to sit on our patio or enjoy the pool during the construction period. Workman [sic] on cranes used to install the tower were able to view back yard and pool area where we were attempting to swim and sun bath during spring break. The workmen were able to view members of the family in their bathing suits which made our family uncomfortable and prevented us from enjoying the use of our yard and pool area. Several homes are for sale in the area around the cell tower and have not been able to be sold in part because of the cell tower. The emotional distress created by the cell tower has also place[d] stress on my marriage, as my wife insists that as a result of its construction and continued use that they move from the area due to radiation, blight and other problems from the cell tower's existence.

I have read the Affidavit of Shawn St. John and dispute the statement in his Affidavit attached to the Defendant's Traditional and No Evidence Motion for Summary Judgment as Exhibit J that there is a stealth or concealed telecommunications tower on the premises of Kirk Elementary School. It is a readily identifiable cell tower, not concealed at all, not blending in, and which is visible by day and night from my home and by virtue of the lighting at and around it illuminating it thereby making it easily visible at night. It is 50 feet from our property and at least 50 feet high. I dispute that there are a number of green areas between my home and the Kirk Facility as there is one small patch of green grass. I dispute that there is a privacy fence that has any impact of the effect of the cell tower to my and my family's senses.

My property has declined in valued approximately $50,000.00 as a result of the construction and existence of the cell tower.

The first paragraph of Jeansonne's affidavit concerns the activities occurring during the 10-day-construction period and possible radio-frequency emissions. As

24

we have already held that the Jeansonnes are not complaining on appeal about those issues, the first paragraph of Clay Jeansonne's affidavit does not raise a fact issue regarding nuisance.

The second paragraph alleges that the property is "a readily identifiable cell tower, not concealed at all, not blending in" and that lighting makes it visible night and day. However, in her deposition, Donna Jeansonne made clear that the nuisance claim was not based on the lights on the tower invading his property, but was because of the tower's looks:

> [Donna Jeansonne]: I'm not sure if additional lighting was added or not. That, I—I want to go on the record as I don't know if they added more lights or not.
>
> [Defense Counsel]: But even if they did add more lights, the issue is not that there's more light coming into your backyard, because, as you testified, you have streetlights that are closer than—
>
> [Donna Jeansonne]: Exactly—
>
> [Defense Counsel]:—those lights?
>
> [Donna Jeansonne]:—I have streetlights.
>
> [Defense Counsel]: The issue is that it makes the tower look worse, right, it's aesthetics.
>
> [Donna Jeansonne]: Of course, I don't like the way it looks.
>
> [Defense Counsel]: Okay. And—with respect to this lighting issue, the issue is aesthetics?
>
> [Donna Jeansonne]: Okay. Yes.

Clay Jeansonne's deposition testimony also confirmed that the suit was based on how the tower looks:

> [Defense Counsel]: And do you have the understanding that what remains in this case are your nuisance claims related to the construction of the tower?
>
> [Clay Jeansonne]: Uh-huh.
>
> [Defense Counsel]: And your nuisance claims related to your claims for loss of property value for how the tower looks in its present location?
>
> [Clay Jeansonne]: Okay.
>
> [Defense Counsel]: Is—is that your—your understanding of what your claims are—
>
> [Clay Jeansonne]: Yeah.
>
> * * * *
>
> [Defense Counsel]: And the reason why you're complaining about that is that you think the tower's unattractive.
>
> [Clay Jeansonne]: I think the tower lower property values.
>
> [Defense Counsel]: And tell me what particular attributes of the tower you think causes it to lower property values.
>
> * * * *
>
> [Defense Counsel]: Do you need me to ask you the question again, Mr. Jeansonne?
>
> [Clay Jeansonne]: No, but I think you have some pictures that would help—

26

[Defense Counsel]: Well . . . before—before we look . . . at the pictures, in your words, tell me what about the tower you think causes it to lower property values?

[Clay Jeansonne]: When you drive in from . . . When you turn, this is Tanner, this is— I'm not sure what this street is. Let me check real quick. I'm sorry, it's actually Summerland Ridge. So the dot is the tower. So when you come from Tanner off of whatever that street is right here, Ginger Ponds I think you said, when you make that turn right there, it looks like a huge smokestack emanating out of that. And these aren't my words. The—unfortunately, I think these words could be very offensive to some people, but these words have been said to me that it looks like a tower from Auschwitz.

[Defense Counsel]: You've said a few times that your family has— you children . . . have referred to the tower as the Willy Wonka Chocolate Factory tower?

[Clay Jeansonne]: Uh-huh.

[Defense Counsel]: And you mentioned earlier today that you heard someone call it a smokestack like from Auschwitz?

[Clay Jeansonne]: Yes.

* * * *

[Defense Counsel]: And—and the primary concern there with describing it that way or as it—it looks like a tower from Auschwitz is how it looks, right?

[Clay Jeansonne]: I would have to say yes.

As made clear, and undisputed, from both Clay Jeansonne's affidavit and deposition testimony, the nuisance suit is based on the Jeansonnes' concern that "[i]t is a readily identifiable cell tower, not concealed at all, not blending in." Thus, despite the Jeansonnes' claim that they have pleaded "nuisance, not aesthetic

27

nuisance," because all their claims involve how the tower looks, this is a distinction without a difference.

As such, this case is controlled by the holdings set forth in *Rankin*, *Shamberger*, *Garrett*, *Jones*, and *Ladd*. Because the Jeansonnes' nuisance claims are based on the unsightliness of a cell-phone tower that they allege looks like an "Auschwitz smokestack" or "Willy Wonka's chimney," the trial court did not err in granting T-Mobile's motion for summary judgment on the Jeansonnes' nuisance claims.

We overrule the Jeansonnes' second issue on appeal.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Massengale and Huddle.